# Exhibit 2

**Ronald L. O'Halloran, M.D.**
2710 Grand Forks Road
Henderson, NV 89052
Phone 805-647-5198
Email vcmedexaminer@yahoo.com

July 2, 2017

Dale K. Galipo, Attorney at Law
21800 Burbank Blvd, Suite 310
Woodland Hills, CA 91367

RE: Joseph Manning Slater death on 4/15/2015
(Salazar et. al. v. Deasey et. al.)

**REPORT OF DR. RONALD O'HALLORAN**

*This report is prepared and submitted pursuant to Federal Rule of Civil Procedure 26.*

Dear Counsel:

As initially requested in late May of 2017, I reviewed the digital paper records, digital video recordings and digital image materials you sent me concerning the April 15, 2015 officer-involved incident regarding the arrest, restraint and subsequent death of Joseph Manning Slater. This report summarizes my findings and conclusions regarding forensic pathology issues involving Mr. Slater's cause of death and substantial factors contributing to his death.

**Summary of Forensic Pathology Qualifications**

My conclusions are based on my knowledge, training, and experience coupled with a critical examination of the record materials I received.

I am a physician, certified by the American Board of Pathology in the medical specialty of anatomic pathology and the subspecialty of forensic pathology. I worked full-time as a forensic pathologist and medical examiner for 33 years, retiring as the Chief Medical Examiner of Ventura County in California on July 1, 2012. After my retirement from Ventura County I continued to investigate deaths and do autopsies on contract with the County for another eight months. I continue to consult as a forensic pathologist. I have conducted more than 8,000 forensic autopsies personally. I have had a special interest in the subject of sudden deaths in custody temporally associated with restraint procedures for more than twenty-five years. I have studied the phenomenon, written scientific papers on the subject and lectured about it. During my career I have autopsied 5-10 such deaths that happened within my medical examiner jurisdictions and consulted on more than 80 similar deaths in other jurisdictions of the United States.

Attached are my curriculum vitae, fee schedule and recent testimony list.

1

**Materials Reviewed**
Prior to preparing this report I reviewed the following records and informational material:

San Bernardino County Sheriff Coroner Division investigation report 4/15/15 by Deputy McCarthy
4 investigative reports by Detective Mooradian:
- Autopsy attendance report
- Interviews of lay witnesses Hosch and Cowell at gas station
- Scene investigation report
- Uniform crime report

Autopsy report by Leticia Schuman, MD in Riverside County on 4/16/15
Toxicology Bio-Tox Laboratories report (blood from autopsy)
NMS Labs (postmortem vitreous fluid chemistry from autopsy)
Death investigation by SBSO De La Torre (Bates 001599-00164) PDF at hospital 4/15/15
Detailed History (Bates 2-4, 3pages)  (incident CAD printout)
Pre-mortem photos of Slater at scene taken by sergeant
Scene photos by deputies including back seat of police car with vomit
Post-mortem photos taken at hospital
Autopsy photos
Hospital postmortem photos
AMR Prehospital Care Report
Deposition of Leticia Schuman, MD, pathologist
Deputy Peter Gentry interview transcript
Deputy Gary Brandt interview transcript
Deputy Shannon Deasey interview transcript
Sergeant Michael Rude interview transcript
Transcription of Interview of FD Kevin Merrill
Transcription of Interview of FD paramedic Todd Beard
Deposition transcript of FD paramedic Todd Beard
Tentative timeline document from Dale Galipo office
Valero Gas Station videos #15 and #8 of incident
Deposition on 6/5/17 transcript Deputy Deasey
Deposition on 6/6/17 transcript Deputy Brandt
Deposition on 6/6/17 transcript Deputy Gentry
Deposition on 6/6/17 transcript Sgt. Rude
Joseph Stater death certificate amended 10/21/2015

*I reserve the right to obtain additional discovery items or records that may assist in my further evaluation of this matter. Additionally, I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that becomes available to me.  In that instance a supplemental report may be submitted. I will also make myself available for deposition by defendants prior to the operative discovery cut-off at a mutually agreeable date and time, upon reasonable request.*

**Summary of the Incident and Circumstances of Injury Causing Death**

*Note:   I have provided this summary for convenience: it does not necessarily itemize every single fact replied upon by this expert in the formation of my conclusions in this matter, and it is based on my review of the aforementioned records-materials.  I do not contend to have direct personal knowledge of the incident facts.*

2

**Joseph Slater (Slater)** was 28 years old at the time of his restraint and death. According to the autopsy report he was 5'11" tall and weighed 168 pounds.

Police were called because of a report that Slater was vandalizing a Valero gas station. First to arrive was **Deputy Sheriff Shannon Deasey (Deasey)**, 5'7" and 160 pounds at 1:23 AM. He was able to handcuff Slater behind his back and walk him to his patrol car where he had Slater get in the back seat from the driver's side. He said Slater was not acting normally. Slater began to resist in the car. Deasey sprayed Slater the face several times with pepper spray, pulled Slater out of the car and wrestled him to the ground in the parking lot of the gas station. Deasey radioed for backup.

The second officer arriving was **Deputy Peter Gentry (Gentry)**, 5'11" and 158 pounds. He held Slater down on the pavement while Deasey got a hobble strap and tried to get it around Slater's ankles.

The third officer to arrive was Deputy **Sgt. Michael Rude (Rude)**. He helped Deasey and Gentry get Slater hobbled around the lower legs and helped get the end of the hobble looped through the chain of the handcuffs behind Slater's back and fastened back on the hobble around the ankles, drawing the legs backward towards the buttocks in a hogtied position.

The fourth officer to arrive was **Deputy Gary Brandt (Brandt)**, 6'0" and 190 pounds. He found the other 3 deputies with Slater on the ground, talking and yelling and sweating. A Cal Fire engine arrived with four staff about the same time. **Fire Paramedic Todd Beard** briefly examined Slater finding his pulse elevated but in the normal range. He said Slater was agitated and didn't make sense when he talked. Deputies carried Slater to the water dispenser at the station and attempted to wash the pepper spray off his head. Slater was uncooperative and struggled, reportedly saying they were pouring gasoline on his head. How much water they actually got on his face for washing is unclear.

Two deputies carried Slater back to Deasey's patrol car and put him prone on the back bench seat via the driver-side rear door. Another deputy from the opposite side helped pull Slater in. They reported Slater was kicking, causing the hobble to loosen at some point. Slater managed to sit on the seat. They closed the doors, discussed the situation for transporting him to jail and decided to get a seatbelt on him. When they opened the back doors again Slater reportedly tried to get out and they were unsuccessful in getting a seatbelt on him. After some struggling with Slater, as deputies pushed his legs from the driver side and one deputy may have been pulling from the passenger side, prone Slater slid most of the way out of the passenger-side door.

Two fixed surveillance cameras were mounted on the gas station building. They were synchronized with each other and recorded the current time by hours, minutes and seconds. Camera 15 captured activity in the parking lot where Slater was first hogtied and also the driver side of the patrol car wherein Slater was confined. Camera 8 captured the passenger side. At approximately 1:43:20 hrs. camera 8 showed Slater sliding out the passenger-side rear door.

Deputies picked Slater up, turned him around, and put him back in the car, prone, but with his head toward the driver side door this time. He was back in the car about 12 seconds after he slid out. In his recorded interview with detectives later that day, Gentry said after they put Slater in the back he tried to fix the hobble. He said the hobble had come loose at the clip and he pulled it back and doubled it over through the handcuff chain and re-attach the clip hook to the strap around his legs to force his ankles back toward his buttocks. Camera 15 shows a deputy close the rear driver-side door at about 1:43:48. Camera 8 shows deputies close the rear passenger-side door at about 1:44:00. At nearly the same time the rear driver-side door was opened again.

3

At 1:44:08 camera 15 shows a deputy slam the rear driver-side door closed again. Deputies then stood near the back of the car reportedly discussing the situation and how to proceed. Deputies reported Slater started to kick or push on the passenger-side rear window. In his recorded interview with detectives later that day deputy Brandt said he went to get another hobble from his car. He and deputy Gentry talked about putting another hobble on Slater's legs so he couldn't kick the window. In Gentry's detective interview he said the plan was to secure Slater's feet better so deputies could get in the car and roll Slater over to a seated position and attach the seatbelt.

At 1:45:15 camera 15 shows a deputy opening the rear driver-side door. A couple seconds later Gentry leaned inside and climbed in with his left foot inside the left passenger foot well. In his recorded interview with detectives Gentry said he got inside the car with a second hobble and went over Slater's back and head. He wrapped the second hobble around Slater's ankles in the same place as the first hobble and fed the hook end through the mesh cage between the front and rear compartments of the car. He said he may have had some pressure on Slater, "My right knee may have been putting some pressure on his left rib area, just from having no place else to stand." He said it took him 15 seconds to put the second hobble on. At the same time Gentry climbed in, Deputy Brandt put his right foot into the car against Slater's left shoulder, preventing him from moving forward. Per camera 15 Gentry was inside the car with Slater about 30 seconds. Brandt had his foot in the car about 90 seconds. Camera 15 shows him removing his foot at about 1:46:35.

During this restraint period with application of the second hobble, Deasey opened the driver's door and, according to interviews, got his hobble from the front passenger foot well and attached it to the end of the 2nd hobble that Gentry had threaded through the cage. Deasey then ran the 3rd hobble behind the cage and through the opened driver-side rear door near the top. He pulled the end of the hobble tight and, as Deasey closed the door on the hobble, it was fixed taught at 1:46:51 per camera 15. In his interview Deasey described Slater as making a spitting noise as he closed the door and his legs stopped moving immediately. Deasey also described that after he closed the door he and other deputies looked through the window and Slater wasn't moving. Deputies stated Slater was still yelling before the door was closed on the hobble strap.

Deputies described Slater's feet as pulled up near his buttocks by the hobble connections. They watched Slater through the driver-side rear window for about 40 seconds. During that interval deputies notice Slater was not moving and didn't seem to be breathing. In his interview Gentry reported that he heard Deasey say that he saw Slater throw up and saw vomit come out his mouth. They opened the rear driver-side door again at 1:47:29 and an officer using a flashlight looked inside. Gentry saw foamy and white chunky stuff in Slater's mouth that looked like vomit. He stated he shook Slater's shoulders and Slater took two deep breaths. At 1:48:15 camera 8 and 15 show Slater being pulled out of the car through the passenger-side rear door and placed on the pavement on his side. He was reportedly unresponsive, not moving and not breathing.

### Summary of Emergency Medical Response:

The Cal Fire Engine crew stayed on scene during the final restraint activities because they were waiting to get a liability release form signed by one of the deputies. **Fire paramedic Todd Beard (Beard)** was the lead medical responder at the scene. He reported in his detective interview and deposition that he watched the restraint activities in the back of the patrol car through the back window but did see Slater through the open driver-side door as deputies pulled him out and on his side initially. When he saw deputies pull Slater's unmoving body out of the

4

car he told the fire engineer to call AMR (ambulance). He then went around the car to Slater's side and had deputies put Slater on his back on the gas station pavement for better medical evaluation. Other firemen went to get the medical equipment out of the fire engine again. Beard said Slater was still in handcuffs but he could feel a pulse. He said Slater had vomit all over his face and had "agonal" (near death) breathing movements.

After the other firemen returned with the rescue gear 30-60 seconds later, Beard could no longer feel a pulse and there was no breathing. Deputy Gentry in deposition estimated it was about a minute after Beard felt a pulse that medics said he had no pulse. Beard cut off Slater's shirt and attached the cardiac monitor/defibrillator leads. The monitor indicated no pulse and no shockable rhythm. Medics cleared vomit from Slater's mouth and intubated the pharynx with a King airway device. Beard said deputies took off the handcuffs after medics started ventilation with a BVM breathing mask but before they started chest compressions. Beard stated they started chest compressions about 2-3 minutes after Slater's removal from car. Video surveillance camera 8 shows two deputies squatting to remove the handcuffs at 1:51:30, about 3.25 minutes after Slater's removal from the car. Camera 8 shows Slater placed on a backboard and chest compressions beginning at 1:52:20, about 4 minutes after removal from the car. Fire medics also started an IV and administered epinephrine.

AMR ambulance arrived at 1:56:30, about 8 minutes after Slater's removal from the car. They assisted with ALS measures and transported Slater to the hospital with intermittent airway suctioning but with no change in his vital sign status. Slater was still unconscious with no neurological function; he was not breathing on his own and he had no spontaneous heart beat or rhythm on cardiac monitor.

The ambulance arrived at Dignity Health St. Bernadine Medical Center Emergency Department at about 02:13 hours. At the hospital the King airway was removed by the ER doctor and replaced with a endotracheal tube after more vomit was suctioning from the airway. Despite continued ALS measures in the hospital there was no change in Slater's status and he was pronounced dead at 02:25.

**Summary of San Bernardino County Sheriff Coroner Division investigation, autopsy, toxicology and death certificate**:

A SBSO detective was contacted about the death and had his supervisor, Sgt. Warrick, contact the Coroner Division because of "excited delirium" concerns, wanting the the hospital to monitor the temperature of Stater's body. The coroner investigator called the hospital and a nurse took the temperature of the body as **98.1 degrees at 0303 hours,** 38 minutes after he was pronounced dead**.**

The Coroner Division investigative report indicates they were called at 0245. The information in it was limited and some information was erroneous. It added no new information not already discussed herein.

An autopsy was conducted on 4/16/15 starting at 09:00, approximately 30 hours after death pronouncement. Dr. Leticia Schuman did the autopsy in Riverside County. She documented multiple contusions and abrasions of arms, legs, head, chest and back. She noted no internal injuries. The heart looked normal on dissection and weight a normal 290 grams. Autopsy photos show the pronounced handcuff abrasions and bruises around the wrists, and the abrasions and bruising around the legs above the ankles from the hobble restraints. Additionally, abrasions and bruising on the left upper back are consistent with Deputy Brandt's description of holding Slater in place on the car seat with his right boot/shoe. A bruise on

5

Slater's right mid-back over the chest area may correspond to Gentry's description of kneeling on Slater in the car while applying the second hobble.

Toxicology and lab chemistry: Autopsy blood was tested for drugs (none was collected at the emergency department during Slater's terminal stay). The blood contained methamphetamine = 1.140 mg/L; amphetamine = 0.116 mg/L. Vitreous fluid was tested by chemistry for electrolytes, BUN, creatinine, and glucose. Considering the near-hour long resuscitation; the 30 hour postmortem interval between death and autopsy eye fluid collection; the vitreous humor source of the sample, and the actual test being conducted a week later, the results are of no diagnostic significance. Prolonged, ultimately ineffective CPR along with the long postmortem effect of cell lysis change body chemistry values from the normal value ranges seen in live people, sometimes dramatically. The very high potassium value is a dramatic example. In fact, postmortem potassium values in serum are meaningless because as cells die the concentrated potassium inside the cells starts diffusing out into the serum. The same happens in vitreous fluid but only more slowly.

A form in the coroner file indicated that in Dr. Schuman's opinion the cause of death was "acute methamphetamine intoxication", and there were no "contributory conditions" related to death. Reading the transcript of Dr. Schuman's deposition gave no indication that she was aware of details of the circumstances of his restraint preceding loss of vital signs.

<u>San Bernardino Sheriff-Coroner filed Death Certificate</u>:
The death certificate was originally signed "pending". 6 months later it was amended by David McCarthy, Deputy Coroner as follow:

107A Cause of death: **Acute methamphetamine intoxication**
112 Significant conditions contributing to death: **None**
119 Manner of death: **Accident**
124 How injury occurred: **Methamphetamine toxicity followed by law enforcement intervention**

**Discussion**

From a forensic pathologist's point of view the evidence is strong that the terminal event that caused Mr. Slater to die was aspirating his own vomit. Vomit was first seen either coming out of mouth our on the patrol car seat in front of his mouth by all four deputy sheriffs involved in restraining him and observing him after he was in the maximal restraint position they put him in. The presence of a significant quantity of vomit in Slater's mouth and airway was confirmed by fire department medics that cared for him immediately after he was removed from the patrol car by deputies and put on the pavement. It was also confirmed by medics in the ambulance where more vomit was seen and removed. Finally, it was confirmed by the emergency physician involved in his terminal care at the hospital where more vomit was suctioned from his lungs after laryngeal intubation.

The question becomes: what caused Slater to vomit and die? The answer lies in understanding the details of what happened in the time before he vomited and observations of his physiological condition after he vomited.

Four sheriff officers were with Mr. Slater, observing him and handling him in the minutes before they heard and saw him vomit. They had previously pepper sprayed his face, handcuffed him behind his back, hobbled his ankles tightly and connected the hobble to the handcuffs in a "hogtie" fashion. He was lying prone on the back seat of a patrol car. Because deputies believed the hogtie was not tight enough to sufficiently contain him, they improvised. Deputies

linked a 2nd hobble strap to Slater's already bound ankles, and attached a 3rd hobble to the 2nd to extend its length. A deputy then threaded the linked hobbles through the car structure, pulled the end of the linked hobbles through the door frame and the open rear driver-side door and closed the door, locking added tension on the new hobble connection. This tension pulled Slater's ankles closer to his buttocks, transferring more of the weight of his legs to his abdomen and chest, the fulcrum for his body weight in his prone position in the car. Since the angle of pull of the new hobble connection was over his back and up towards his head, but also somewhat to his right, generally extended above and over his right shoulder area, it would likely rotate his left hip upward somewhat.

It was immediately after the door closed, locking-in the maximum restraint position of Slater that night, that deputies noticed he had vomited. But they also noticed he was unresponsive, unconscious and either not breathing at all or having only minimal breathing-like movements. He was pulled out of the back seat soon after, placed on the ground and attended by a medic who felt that he still had a pulse.

The significance of Slater still having a pulse while he was unconscious and not breathing is that the coroner's opinion about the cause of death is likely wrong. Methamphetamine can cause death by inducing cardiac arrhythmias and cardiac arrest, but Slater still had a pulse when he was already unconscious and not breathing, so the methamphetamine in his system is an improbable explanation for his loss of consciousness, his respiratory arrest and his vomiting. Methamphetamine can cause death through markedly elevating body temperature, but his temperature was normal less than an hour after he was pronounced dead.

The very close temporal relationship between Slater being in a maximal restraint situation, with added pressure on his abdomen and chest, likely caused him to vomit, aspirate and asphyxiate. Since it is not clear from deputy observations whether or not Slater was unconscious before he aspirated vomit, it is also a reasonable possibility that he lost consciousness from partial hypoxia in his restrained position, causing vomiting. Whether Mr. Slater vomited and asphyxiated or was asphyxiating when he vomited, the way Slater was restrained was part of the causal chain of physiological events directly causing his death.

### Conclusions (Opinions) and Bases

*Note that all of my opinions expressed herein are to a reasonable degree of medical probability or certainty unless expressed otherwise.*

**Conclusion 1 – Joseph Slater died because of asphyxia while being restrained by deputy sheriffs.**

Conclusion 1 is based primarily on the following considerations:

<u>The reports, statements, depositions and interview transcripts by sheriff officers and firemen witnesses</u>:
- These documents describe the restraint processes, how they occurred, their approximate duration and Slater's response to them. They establish that Mr. Slater was restrained prone on the back bench seat of a patrol car in a prone hogtie position, handcuffed behind his back, and hobbled about his ankles with the hobble fastened around the handcuffs chain such that the hobble pulled his knees up toward his buttocks in a flexed position. Simultaneously, one sheriff deputy's foot was holding Slater's upper back in the shoulder area down on the seat while another deputy was over Slater's body with a knee on his back. Additionally, shortly before Slater lost consciousness, vomited and effectively stopped

7

breathing, second and third hobbles were connected sequentially to the first hobble at the ankles and used to cinch Slater's ankles even closer, tighter and higher toward his buttocks. The third hobble strap was run through the metal cage structure and through the open left rear door at the top of the B pillar, pulled tight and the door closed on the taught strap, effectively locking Slater in a tight prone hogtie position with his weight focussed on his chest and abdomen. Within seconds of closing the door on the hobble strap deputies and a fire paramedic noticed Slater was not moving, had vomited and was unresponsive. Approximately a minute and a half after the door was closed on the hobble strap, paramedic Beard said he could still feel a pulse. All deputies heard him say the same. Medics removed vomit from Slater's airway at the scene and suctioned more from his airway in transit in the ambulance. The emergency doctor at the hospital reported even more vomit was still in Slater's trachea and was suctioned out again in the ER before and after an endotracheal tube was inserted.
- Medical literature, and many reports of unconscious near-drowning incidents, clearly indicate that the brain is more sensitive to lack of oxygen supply than is the heart. When oxygen delivery to the body is limited by cessation of effective breathing, loss of consciousness is the first observable life threatening phenomenon. The heart is not as sensitive as the brain is to diminished oxygen in the blood. The heart usually continues to beat for minutes after loss of consciousness from hypoxia. But in Slater's case his heart was still beating when he was clearly already unconscious for over a minute. This is evidenced by Fire Paramedic Beard feeling Slater's pulse after he was pulled out of the patrol car by deputies, more than a minute after it was obvious he was unresponsive, not breathing and unconscious.
- Clearly, respiratory compromise, vomiting with aspiration of vomit into Slater's airway, and loss of consciousness happened within seconds of the final hobbles being attached and pulled tight. In my opinion, the prone and hobbled position Slater was in compromised his ability to breathe, compressed his abdomen and chest, and lead to his vomiting and aspirating the vomit into his lungs. This prevented sufficient breathing, leading to loss of consciousness and resulting in death. The presence of a pulse more than a minute after he vomited and lost consciousness indicates that a cardiac arrhythmia probably did not cause the loss of consciousness and the loss of breathing that lead directly to Mr. Slater's death.

**Conclusion 2 - Multiple stressors probably contributed to Mr. Slater's death. These stressors include physical exertion, pepper spray, fear, asphyxia by restraint measures, pain and the effects of methamphetamine**.

Conclusion 2 is based on the following considerations:

- Forceful physical exertion burns energy and requires increased oxygen consumption through more rapid and deeper breathing along with an increase heart rate and an increase in the force of heart contractions to increase blood pressure. Slater exerted himself by struggling against the deputies; struggling against the restraints they applied, and struggling against the added compression in the patrol car caused by the weight of deputies holding him down while more hobbles were attached and tightened.
- The stress from pain from the many ways Slater was restrained and the injuries he sustained in the process, along with the pain caused by pepper spray in his face, likely increased the catecholamine effect on his body, increasing metabolic and oxygen demands.
- The methamphetamine present in Slater's system at the time of his death likely contributed to increasing the amount of catecholamine stress and oxygen demands on his body.
- As discussed previously, the probable trigger for Slater's vomiting and ultimately for his asphyxial death was likely the effects of the way he was restrained prone; hogtied, and compressed even more by the pressure on his back by two deputies. Even more pressure was applied to Slaters abdomen and chest by his legs being drawn upward and back

8

towards his buttocks with the addition of more hobbles and the improvised technic used to increase the tension on the 2nd and 3rd hobbles. The nearly simultaneous loss of consciousness and vomiting when the added compression and hobbling occurred argues strongly for a cause-effect relationship physiologically.

**Conclusion 3 – Had Mr. Slater not been restrained the way he was, he would not have died that day.**

Conclusion 3 is based primarily on the following considerations:
- It is likely that the struggle with deputies and the restraint process itself caused physiological stresses which collectively caused of death. The primary and sufficient stressor was respiratory restriction and chest/abdominal compression by the way he was restrained causing vomiting with deep aspiration of the vomit, as described above. The final restraint episode likely caused asphyxia with respiratory arrest, loss of consciousness, subsequent cardiac arrest, and irreversible anoxic brain damage for the reasons described previously.
- The timing of Slater's vomiting and loss of consciousness, soon followed by loss of cardiac function, all in such close temporal proximity to being in a respiratory compromising position in the back of a police car, preceded by a prolonged struggle with deputies, argues for a cause-effect relationship. Slater was a young man with no diseases known or found at autopsy. The chance that he would drop dead that day from just the methamphetamine in his body is slim. Even with the evidence he had methamphetamine in his system, the chance he would suddenly die from the drug, absent the restraint stress, is small. The fact that his body temperature was normal less than an hour after he was pronounced dead makes the chance even smaller. In people with methamphetamine intoxication brought to the emergency room, deaths are almost always associated with hyperthermia (markedly elevated body temperatures). (1) (reference below)

**Conclusion 4 - Joseph Slater's death would more accurately be classified as a "homicide" on his death certificate and the cause of death more properly attributed to asphyxia by aspiration of vomit during law enforcement restraint procedures.** If I was the medical examiner or coroner charged with issuing the death certificate and studied the materials I was provided in this case, I would certify the death as follows:

107A Cause of death: **Asphyxia by aspiration of vomit during law enforcement restraint procedures**

112 Significant conditions contributing to death: **Physiological stress from methamphetamine toxicity, exertion, partial compression, fear and pain**

119 Manner of death: **Homicide**

124 How injury occurred: **Subject aspirated vomit while bound and restricted prone in patrol car by law enforcement officers**

Conclusion 4 is based on the following considerations:
- The reports, statements, and transcripts of police officers, dispatch and fire rescue personnel along with scene videos, medical records and autopsy findings. These all support the opinions I would have expressed on the death certificate.
- My training and experience as a physician and forensic pathologist. This includes training and experience issuing death certificates in medicolegal death investigation offices for 33 years as a medical examiner.

- Note that the classification of a death as a homicide on a death certificate does not require that it be considered a murder nor does it imply there was intent to cause injury. By convention it means that, in the opinion of the legal officer certifying the death, the death was caused by the actions of other person(s), that is, "death at the hands of other(s)".

**Closing Remarks**

The foregoing conclusions are stated to a reasonable degree of medical or scientific probability or certainty based on my background, training, and experience and my review of the record materials previously identified. I reserve the right to supplement, add, change, and/or delete any of my conclusions-opinions based on additional facts or evidence that becomes available to me, at which time a supplemental report may be submitted.

Respectfully,

*[signature: Ron O'Halloran]*

Ronald L. O'Halloran, MD

Reference:

**(1) Methamphetamine-induced toxicity: an updated review on issues related to hyperthermia**

Matsumoto RR1, Seminerio MJ2, Turner RC3, Robson MJ4, Nguyen L5, Miller DB6, O'Callaghan JP6. Pharmacol Ther. 2014 Oct;144(1):28-40. doi: 10.1016/j.pharmthera.2014.05.001

Abstract: Reports of methamphetamine-related emergency room visits suggest that elevated body temperature is a universal presenting symptom, with lethal overdoses generally associated with extreme hyperthermia. This review summarizes the available information on methamphetamine toxicity as it pertains to elevations in body temperature. First, a brief overview of thermoregulatory mechanisms is presented. Next, central and peripheral targets that have been considered for potential involvement in methamphetamine hyperthermia are discussed. Finally, future areas of investigation are proposed, as further studies are needed to provide greater insight into the mechanisms that mediate the alterations in body temperature elicited by methamphetamine.

10