1  Eugene P. Ramirez (State Bar No. 134865)
     *epr@manningllp.com*
2  Tony M. Sain (State Bar No. 251626)
     *tms@manningllp.com*
3  Andrea K. Kornblau (State Bar No. 291613)
     *akk@manningllp.com*
4  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
5  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
6  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
7
8  Attorneys for Defendants,
   COUNTY OF SAN BERNARDINO;
   DEP. SHANDON DEASEY; DEP.
9  PETER GENTRY; DEP. GARY
   BRANDT; AND SGT. MIKE RUDE
10

**UNITED STATES DISTRICT COURT**

11

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13

14  DANIELLA SLATER AND DAMIEN
    SLATER, individually and as
15  successors in interest, by and through
    their Guardian ad Litem Sandra Salazar;
16  TINA SLATER AND DAVID
    BOUCHARD, individually,
17
            Plaintiffs,
18
    v.
19
    DEPUTY SHANDON DEASEY;
20  DEPUTY PETER GENTRY; DEPUTY
    GARY BRANDT; SGT. MIKE RUDE;
21  COUNTY OF SAN BERNARDINO;
    DOES 1-10, Inclusive
22
            Defendants.
23

Case No. 5:16-CV-01103-JFW-KK
[*Hon. John F. Walter, District Judge;
Hon. Kenly K. Kato, Magistrate Judge*]

**NOTICE OF MOTION AND
DEFENDANTS' MOTION TO
EXCLUDE OPINIONS OF
PLAINTIFFS' EXPERT WITNESS
DR. RONALD O'HALLORAN
[DAUBERT MOTION];
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT**

[Declaration of Tony M. Sain and
Proposed Order filed concurrently]

Date:       September 11, 2017
Time:       1:30 p.m.
Ctrm:       7-A

Cmplt Filed:  May 27, 2016
PTC Date:    September 29, 2017
Trial Date:   October 17, 2017

24

25

26

27          TO PLAINTIFFS DANIELLA SLATER AND DAMIEN SLATER (individually

28  and as successors in interest, by and through their Guardian ad Litem Sandra Salazar),

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

TINA SLATER, AND DAVID BOUCHARD, AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on the 11th day of September, 2017, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom "7-A" of the above-captioned Court, located at 350 West 1st Street, Los Angeles, California, 90012, Defendants COUNTY OF SAN BERNARDINO, DEPUTY SHANDON DEASEY, DEPUTY PETER GENTRY, DEPUTY GARY BRANDT, and SERGEANT MIKE RUDE ("defendants") will move this Court for an Order to exclude to exclude all of the expert opinions of plaintiffs' expert witness Dr. Ron O'Halloran, both at trial and in conjunction with defendants' Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, being filed concurrently with this motion.

This motion is made on the grounds that the opinions of plaintiffs' expert O'Halloran are inadmissible and lacks adequate evidentiary support under the controlling case law associated with *Daubert v. Merrell Dow Pharms*., 509 U.S. 579 (1993). Specifically, Defendants seek to exclude: (1) All of Dr. Ron O'Halloran's opinions that Slater died by positional, compressional, or any other form of asphyxia – on grounds of speculation and insufficient evidentiary support; and (2) All of Dr. O'Halloran's opinions on the import of Slater's alleged, reported, or monitored heart rhythms – on the ground that O'Halloran lacks sufficient expertise because: (a) he has never treated a living patient ever, and thus has no experience or expertise in interpreting the import of cardiac rhythms; and (b) he is not a cardiologist. Thus, the cardiac-related opinions of O'Halloran cannot be stated to a reasonable degree of medical certainty and inherently lack adequate factual support, so as to be speculative and inadmissible under Fed. R. Evid. 702 precepts.

This motion is based on the attached memorandum of points and authorities, declaration(s), and attached exhibits, all the pleadings, records, and files in this action and upon such further oral and documentary evidence as may be presented upon the hearing of this motion.

1    This motion is made following the conference of counsel pursuant to L.R. 7-3
2  which took place on August 3, 2017.  However, during such conference, the parties
3  were unable to resolve the issues underlying defendants' potential motion to exclude.
4  [*See* U.S. Dist. Ct., C.D. Cal. L.R. 7-3.]

5  DATED:  August 14, 2017          **MANNING & KASS**
6                                   **ELLROD, RAMIREZ, TRESTER LLP**

7

8                          By:    ___/s/ Tony M. Sain_____
9                                     Eugene P. Ramirez, Esq.
10                                    Tony M. Sain, Esq.
                                      Andrea K. Kornblau, Esq.
11                                 Attorneys for Defendants,
                                   COUNTY OF SAN BERNARDINO;
12                                 SHERIFF JOHN McMAHON; DEP.
13                                 SHANDON DEASEY; DEP. PETER
                                   GENTRY; DEP. GARY BRANDT; AND
14                                 SGT. MIKE RUDE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

1.    INTRODUCTION AND SUMMARY OF ARGUMENT (*DAUBERT*)..........4

2.    A DAUBERT MOTION MAY BE FILED IN CONJUNCTION WITH A MOTION FOR SUMMARY JUDGMENT.......................................................5

3.    SUMMARY OF RELEVANT EXPERT OPINIONS BY DR. RONALD O'HALLORAN. ......................................................................................5

4.    O'HALLARON'S OPINION THAT SLATER DIED BECAUSE OF ASPHYXIA WHILE BEING RESTRAINED BY DEPUTY SHERIFFS LACKS FACTRAL SUPPORT. ...................................................................8

    A.    There Is No Evidence Supporting O'Halloran's Opinion That Slater Was In A Flat Chest-Down Position For More Than A Few Seconds. ............................................................................................8

    B.    Even If Slater Was In A Flat Chest-Down Position For 90 Seconds, This Is An Insufficient Amount Of Time To Cause Death By Asphyxia Which Requires At Least Two Minutes Of Continuous Deprivation Of Air...............................................................................12

    C.    There Is No Evidence Supporting O'Halloran's Opinion That Slater's Vomiting Might Have Contributed To His Asphyxiation Because There Is No Evidence At All That Slater Had Any Vomit In His Lungs Or Choked Thereon...........................................................13

5.    O'HALLORAN IS NOT QUALIFIED TO TESTIFY ON THE IMPORT OF SLATER'S ALLEGED, REPORTED, OR MONITORED HEART RHYTHMS............................................................................................14

6.    THE COURT SHOULD EXCLUDE DR. O'HALLORAN'S OPINIONs THAT SLATER DIED BY ANY FORM OF ASPHYXIA BECAUSE HIS OPINIONS LACK EVIDENTIARY SUPPORT AND DO NOT MEET THE THRESHOLD FOR *DAUBERT* ADMISSIBILITY. .................16

    A.    The *Daubert* Threshold for Expert Opinion Evidence. ........................16

    B.    To Be Admissible, A Medical Expert's Opinion Must Be Supported By A Reasonable Degree of Medical Certainty....................................18

7.    CONCLUSION. ....................................................................................21

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
—— *Attorneys at Law* ——

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bulthius v. Rexall Corp.*
789 F.2d 1315 (9th Cir. 1986)......................................................................19

*Claar v. Burlington N.R.R.*
29 F.3d 499 (9th Cir. 1994).........................................................................5

*Daubert v. Merrell Dow Pharms*.
509 U.S. 579 (1993) ...........................................................................passim

*General Elec. Co. v. Joiner*
522 U.S. 136 (1997) ...................................................................................17

*Guam v. Reyes*
879 F.2d 646 (9th Cir. 1988) .....................................................................18

*Guidroz-Brault v. Missouri Pacific R.R. Co.*
254 F.3d 825 (9th Cir. 2001).....................................................................19

*Hangarter v. Provident Life & Accident Ins. Co.*
373 F.3d 998 (9th Cir. 2004)......................................................................16

*In re Live Concert Antitrust Litigation*
863 F. Supp. 2d 966 (C.D. Cal. 2012)........................................................5

*In Re Midland National Life Insurance Co. Annuity Sales Practices Litigation*
*v. Allianz Life Insurance Company of North America*
686 F.3d 1115 (9th Cir. 2010)....................................................................5

*Kennedy v. Southern Cal. Edison Co.*
268 F.3d 763 (9th Cir. 2001) .....................................................................18

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) ...................................................................................16

*Lajoie v. Thompson*
217 F.3d 663 (9th Cir. 1999).....................................................................18

*Lash v. Hollis*, 2007
U.S. Dist. LEXIS 3633 (E.D. Mo. 2007) ..................................................18

*Lineaweaver v. Plant Insulation Co.*
31 Cal.App.4th 1409 (1995)......................................................................18

*Rutherford v. Owens-Illinois*
16 Cal.4th 953 (1997)................................................................................17

*Saelzler v. Advanced Group 400*
25 Cal.4th 763 (2001)................................................................................17

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

*Stilwell v. Smith & Nephew, Inc.*
      482 F.3d 1187 (9th Cir. 2007)..........................................................17

*U.S. v. Various Slot Machines on Guam*
      658 F.2d 697 (9th Cir. 1981)..........................................................19


**<u>FEDERAL STATUTES</u>**

Fed. R. Evid. 702 ..................................................................................15, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.   INTRODUCTION AND SUMMARY OF ARGUMENT (*DAUBERT*).

Defendants respectfully request that the honorable Court **exclude** Dr. O'Halloran's testimony and opinions both at trial and in conjunction with Defendants' Motion for Summary Judgment for the following reasons:

As set out in full in the accompanying Motion for Summary Judgment, this is a police/civil rights-wrongful death case arising out of the April 15, 2015 incident between San Bernardino County Sheriff's Department deputies and Joseph Slater. The coroner's autopsy report listed the cause of Mr. Slater's death as acute methamphetamine intoxication.  Defendants seek to exclude the opinions of plaintiffs' expert, Dr. Ronald O'Halloran, that Mr. Slater died by positional, compressional, or any other form of asphyxia – on grounds of speculation and insufficient evidentiary support. O'Halloran's theory is that the deputies caused Slater to asphyxiate by placing him in a chest down position in the back seat of the patrol car, and by placing their body weight on him in that position so as to cause Slater to vomit and aspirate therein. O'Halloran's theory of asphyxia lacks evidentiary support because: (1) There is no evidence that Slater was in a flat chest-down position for more than a few seconds,  thus negating the foundational premise of O'Halloran's theory of death by asphyxia; (2) Even if Slater was in a flat chest-down position for 90 seconds, this is an insufficient amount of time to cause death by asphyxia which requires at least two minutes of continuous deprivation of air; and (3) There is no evidence supporting O'Halloran's opinion that Slater's vomiting might have contributed to his asphyxiation, because there is no evidence at all that Slater had any vomit in his lungs or choked thereon.

Secondly, Dr. O'Halloran's opinions on the import of Slater's alleged, reported, or monitored heart rhythms should be excluded on the ground that O'Halloran lacks sufficient expertise because: (a) he has never treated a living patient ever, and thus has no experience or expertise in interpreting the import of cardiac rhythms; and (b) he is not a cardiologist. Thus, the cardiac-related opinions of O'Halloran cannot be stated to a

reasonable degree of medical certainty and inherently lack adequate factual support under *Daubert v. Merrell Dow Pharms*., 509 U.S. 579 (1993).

As a result, O'Halloran's opinions fail to meet the *Daubert* standard and must be excluded from evidence in all proceedings in this action, including in relation to Defendants' Motion for Summary Judgment.

## 2.   A DAUBERT MOTION MAY BE FILED IN CONJUNCTION WITH A MOTION FOR SUMMARY JUDGMENT.

Defendants seek to exclude O'Hallaron's opinions both at trial and in conjunction with Defendants' Motion for Summary Judgment being filed concurrently with this motion.

"[P]rior to ruling on summary judgment motion, '[t]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.  The primary source of this obligation is Rule 702.'" *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 971 (C.D. Cal. 2012) (parentheticals omitted), citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994). "[A] Daubert motion connected to a pending summary judgment motion may be effectively 'dispositive of a motion for summary judgment.' [citations]." *In Re Midland National Life Insurance Co. Annuity Sales Practices Litigation v. Allianz Life Insurance Company of North America*, 686 F.3d 1115, 1119 (9th Cir. 2010).

## 3.   SUMMARY OF RELEVANT EXPERT OPINIONS BY DR. RONALD O'HALLORAN.

In this case involving the April 15, 2015 incident between San Bernardino County Sheriff's Deputies and Joseph Slater, the coroner's autopsy report listed the cause of Mr. Slater's death as acute methamphetamine intoxication. (Exhibit H:Schuman Dep., 34:4-13, 35:23-25, 52:12-17.) Defendants seek to exclude the opinions of plaintiffs' expert, Dr. Ronald O'Halloran, that the cause of Mr. Slater's death was asphyxia while being restrained by deputy sheriffs.

Plaintiffs' sole medical expert, Dr. Ronald O'Halloran, is a forensic pathologist.

1   (O'Halloran deposition ("O'Hall.depo."):13:16-21 [Exhibit A]) and former medical

2   examiner (*Id*. at 15:8-13; 25:24-26:3). O'Halloran was not a witness to the incident at

3   issue in this action. (*Id*. at 38:11-17.) O'Halloran did not conduct any site inspection of

4   the incident location at the Valero Gas Station. (*Id*. at 38:19-22.) O'Halloran never

5   physically examined, inspected, or performed an autopsy decedent Joseph Slater. (*Id*. at

6   38:23-39:1)  O'Halloran admitted that none of his opinions in this case rest on any

7   autopsy examination that he conducted of Slater. (*Id*. at 39:22-40:1.)

8        O'Halloran submitted his expert report dated July 2, 2017 [Exhibit B], and a

9   supplement report dated July 15, 2017 [Exhibit C].  O'Halloran submitted the following

10   opinions:

11        **Opinion No. 1:**

12         Joseph Slater died because of asphyxia while being restrained by deputy sheriffs.

13   (Exhibit B:7-2-17 report, pg. 7; Exhibit A:O'Hall.depo.49:21-24; 50:2-9; 10-16, 50:17-

14   51:2; 51:3-13; 51:14-21; 51:22-52:5; 52:6-16; 52:17-22;  52:23-53:2; 53:3-15.)

15        **Opinion No. 2:**

16        Multiple stressors probably contributed to Slater's death including physical

17   exertion, pepper spray, fear, asphyxia by restraint measures, pain and the effects of

18   methamphetamine. (Exhibit B:7-2-17 report, pg. 8; Exhibit A:O'Hall.depo 54:8-15;

19   54:8-55:2; 55:3-9;  55:9-19; 55:20-25; 56:1-5.)

20        **Opinion No. 3**:

21        Had Slater not been restrained the way he was, he would not have died that day.

22   (Exhibit B:7-2-17 report, pg. 9; Exhibit A:O'Hall.depo. 56:6-9; 56:10-15; 56:16-20;

23   56:21-57:7; 57:8-21.)

24        **Opinion No. 4**:

25        Joseph Slater's death would more accurately be classified as a "homicide" on his

26   death certificate and the cause of death more properly attributed to asphyxia by

27   aspiration of vomit during law enforcement restraint procedures. (Exhibit B:7-2-17

28   report, pg. 9; Exhibit A:O'Hall.depo.57:22-58:2; 58:3-12; 58:13-17; 59:6-11; 59: 12-

1   17.)

2       **<u>Rebuttal Opinions Nos. 5 to 7:</u>**

3       O'Halloran rebuttal opinions Nos. 5 to 7 contain his disagreement with

4   Defendants' experts' opinions as to the cause of Slater's death for the same underlying

5   reason: O'Halloran's opinion is that Joseph Slater died because of asphyxia while being

6   restrained by deputy sheriffs. ( Exhibit A:O'Hall.depo.49:21-24; 50:2-9; 10-16, 50:17-

7   51:2; 51:3-13; 51:14-21; 51:22-52:5; 52:6-16; 52:17-22;  52:23-53:2; 53:3-15.)

8       O'Halloran disagrees with Defendants' expert Richard Clark, M.D.'s expert

9   opinion  that Slater's struggle with officers, coupled with his agitated activity and drug

10  use, likely resulted in a metabolic acidosis of his blood, possible electrolyte

11  abnormalities, and possible high body temperature, conditions that caused his heart to

12  be more susceptible to the toxic effects of methamphetamine that he was using that day,

13  and most likely led to an irregular heart rhythm and cardiac arrest. (Exhibit C:7-15-17

14  Supplemental report, pg. 1; Exhibit A:O'Hall.depo.60:7-19; 61:3-16; 61:17-62:4; 62:5-

15  19; 62:20-63:1; 63:16-64:1).

16      O'Halloran disagrees with Defendants' expert Richard Ruffalo, M.D.'s expert

17  opinion that to a reasonable degree Slater's underlying methamphetamine toxicity was

18  the cause of his death and his opinion that excited delirium is the more precise

19  description of Slater's cause of death. (Exhibit C:7-15-17 Supplemental report, pgs. 2-3;

20  Exhibit A:O'Hall.depo.64:5-20; 64:21-65:10; 65:11-22; 65:23-66:14; 66:16-67:3; 67:4-

21  7; 67:8-13; 67:20-25; 68:1-14; 68:15-23; 69:1-7; 69:8-14).

22      O'Halloran disagrees with Defendants' expert Theodore C. Chan, M.D.'s factual

23  summary of the circumstances of Slater's death and his opinion that Slater's death was

24  not caused or contributed to by positional, restraint or compression asphyxiation as a

25  result of the manner in which he was restrained by law enforcement officers. (Exhibit

26  C:7-15-17 Supplemental report, pgs. 3-4; Exhibit A:O'Hall.depo.69:8-70:9; 70:10-14;

27  70:15-71:2; 71:3-18; 71:19-72:12; 72:8-12; 72:31-9; 73:10-22; 73:23-74:1; 74:2-22;

28  74:23-75:2.)

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

As noted above, O'Halloran's rebuttal opinions are all based on the same foundational opinion by O'Halloran that the cause of Slater's death was asphyxia while being restrained by deputy sheriffs.

**4.    <u>O'HALLARON'S OPINION THAT SLATER DIED BECAUSE OF ASPHYXIA WHILE BEING RESTRAINED BY DEPUTY SHERIFFS LACKS FACTRAL SUPPORT.</u>**

**A.    <u>There Is No Evidence Supporting O'Halloran's Opinion That Slater Was In A Flat Chest-Down Position For More Than A Few Seconds.</u>**

Dr. O'Halloran's opinion that Slater died by positional, compressional, or any other form of asphyxia lacks sufficient evidentiary support under *Daubert*. O'Halloran's theory is that the deputies caused Slater to asphyxiate by placing him in a chest down position in the back seat of the patrol car, and by placing their body weight on him in that position so as to cause Slater to vomit and aspirate therein. O'Halloran testified that asphyxia is lack of oxygen delivery to the cells in the body that need it either from not getting enough air into the lungs or not enough circulation to the cells in the organs that are important. (Exhibit A:O'Hall.depo.100:22-101:3.) O'Halloran's theory of asphyxia is that Slater was in a flat chest-down position such that he could not breathe in air, leading to loss of consciousness and resulting in death, and that he was he was put in a hobble position prone on his chest for while in the backseat of the patrol car. (Exhibit B:7-2-17 report, pg. 8; Exhibit A:O'Hall.depo. 50:17-51:2; 53:3-58:17.)

The first fatal flaw in O'Halloran's theory is that there is no testimony that Slater was in a flat, chest-down position for more than two to three seconds. (Exhibit A:O'Hall.depo. 138:13-23, citing Exhibit D:Deasey depo.: 138:4-9.) SBSD Deputy Shannon Deasey's testimony was that Slater was on his side, as opposed to a chest-down position in the seat. (Exhibit A:O'Hall.depo. 138:24-139:9, citing Exhibit D:Deasey depo. 141:20-142:2.) Deasey testified that from the time that the patrol car rear door was closed the final time, until the time that Slater was later discovered to be unresponsive, during that entire period of time, Slater was on his left side, facing the

1   cage, with only the area from his left nipple to his left armpit touching the backseat.
2   (Exhibit A:O'Hall.depo. 139:10-25, citing Exhibit D:Deasey depo. 143:24-144:6;
3   146:19-23; 157:14-20; 158:12-21; 160:20-161:13; 121:19-122:3.)

4       SBSD Deputy Pete Gentry's testimony was that after initially being on his
5   stomach in the back seat for a few seconds, the only position that Slater was in on the
6   patrol car back seat was on his left or right side, with only a portion of his stomach
7   touching the seat. (Exhibit A:O'Hall.depo. 141:8-142:15, citing Exhibit J:Gentry depo,
8   76:8-16; 89:24-91:6; 92:4-24:93:4-19.)  Gentry testified that while Slater was in the
9   backseat of the patrol car, he was never in a flat chest-down or flat stomach-down
10  position. (Exhibit A:O'Hall.depo. 142:16-143:3, citing Exhibit J:Gentry depo: 89:24-
11  91:6) Gentry testified that the only time that Slater was ever on his stomach in the
12  backseat is when he was put in initially, and that only lasted for a few seconds. (Exhibit
13  J:Gentry depo. 32:11 -33:15.) When Gentry was inside of the back of the patrol car
14  with Slater, Slater was never in a chest-down or stomach-down, flat on the back seat
15  position, and Gentry never put any body weight on Slater's torso at any time while
16  Slater was in the back of the patrol car.  (Exhibit J:Gentry dep., 92:20-24, 93:4-19.)

17      The testimony shows that once the second and third hobbles were applied, Slater
18  was facing the cage and was not chest flat down; his left shoulder, left breast, and left
19  chest area were against the bottom of the seat. (Exhibit D:Deasey Dep., 143:24-144:6,
20  157:14-20, 158:12-21,160:20-161:13.) During the entire time when Slater was in the
21  back seat of the patrol car before he became unresponsive and stopped moving, Slater
22  was never chest flat down on the back seat. (Exhibit D:Deasey Dep., 143:24-144:6,
23  146:19-23.)  After the third hobble was applied and the door was closed, Slater was in
24  the back seat canted to the left with a portion of his stomach on the seat but not flat on
25  his stomach, and his feet were facing toward the back rest portion of the back seat.
26  (Exhibit D:Deasey Dep., 81:22-82:3;  Exhibit K: SBSD Sergeant Mike Rude Dep.,
27  117:15-118:4.)

28      For the periods of time that SBSD Deputy Gary Brandt could see Slater in the

car, Slater was not in a position with his chest or his stomach flat down on the back seat of the car.  (Exhibit E:Brandt Dep., 65:23-66:7; 72:10-13.) At no time during the incident, whether inside or outside of the car, did Brandt ever see Slater in a flat, chest-down or stomach-down position. (Exhibit E:Brandt Dep., 66:8-12.)

When Gentry and Brandt initially tried to put Slater into the back seat driver's side of Deasey's vehicle, Slater was thrashing and moving about. (Exhibit D:Deasey Dep., 48:1-11; Ex. K:Rude Dep., 122:22-123:9.) The longest amount of time Gentry or Deasey ever saw Slater in a chest-down position in the back of the car was about 2 to 3 seconds.  (Exhibit D:Deasey Dep., 138:4-9; Ex. D, Exhibit J:Gentry dep., 33:8-15.) Before Slater went unresponsive, Deasey did not ever see Slater in a chest-down position when he was outside the car.  (Exhibit D:Deasey Dep.,  138:18-21.) At no point in time when Rude could see Slater in the back seat was Slater ever flat, chest down on the back seat, or stomach down on the back seat.  (Exhibit K:Rude Dep., 125:24- 126:12.)

Fire EMT Captain Kevin Merrill has no recall of Slater ever being in a flat-down, prone position, or of a deputy putting pressure on Slater's back.  (Exhibit F:Merrill Dep., 29:18-30:1.)

Bystander witness Cowell testified that when Slater was in the back of the patrol car the second time, he did not see any of the deputies touching Slater anymore. (Exhibit G:Cowell depo.:82:4-15.) Cowell testified that from the time when he saw Slater put into the back of the patrol car on the  second occasion, after he was seated in the back of that patrol car until Cowell saw him go horizontal in the back of the patrol car, between those two points of time, Cowell did not ever see any deputy touch Slater. (Exhibit G:Cowell depo.:83:2-13.)  Cowell did not see any deputy do anything to cause Slater to move from a seated position to a horizontal position in the back of the patrol car, (Exhibit G:Cowell depo. 84:9-13.)

O'Halloran conceded that based on the evidence that he reviewed in this case, no deputy besides Deputy Gentry ever touched Slater's back with the deputy's knee while

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  in the backseat of the patrol car. (Exhibit A:O'Halloran depo.: 161:2-7.) Gentry testified

2  that while Slater was in the backseat of the patrol car, he was never in a flat chest-down

3  or flat stomach-down position. (Exhibit J:Gentry depo: 89:24-91:9-93:19.)

4        In sum, there is no evidence that Slater was in a flat, chest-down position on the

5  back seat for more than a few seconds, thus negating the foundational premise of

6  O'Halloran's theory of death by asphyxia. Based on the actual evidence, if Slater's chest

7  or front of his torso was never pressed against a surface in the back of the patrol car,

8  there could be no impairment of his breathing sufficient to cause his asphyxia in the

9  backseat. O'Halloran conceded that under these circumstances, asphyxia is not likely to

10  occur. (Exhibit A:O'Halloran depo.:214:24-215:7.)

11        In addition, given that O'Halloran had not examined Slater's body, he failed to

12  give adequate weight to the conclusion of the medical examiner, Dr. Schuman, who

13  conducted the autopsy of Slater. Based on her examination of Slater's body, Dr.

14  Schuman concluded that Slater did not die of asphyxia. (Exhibit A:O'Halloran depo.:

15  168:14-170:20, citing Exhibit H:Schuman depo.:82:17-25.) O'Halloran conceded that

16  he previously testified in another case that he never handled a case as a medical

17  examiner where there was an officer-associated death where he determined a cause of

18  death without examining the decedent's body. (O'Halloran depo.:166:9-19.) O'Halloran

19  conceded that it is standard practice for a forensic pathologist to examine the body

20  before determining cause of death in such an officer-associated case. (*Id*. at 166:22-

21  167:3.) O'Halloran did not conduct any forensic or laboratory tests on Slater, or any of

22  his body parts and did not examine the body of Slater. (*Id*. at 167:5-17.) O'Halloran

23  conceded that Dr. Schuman, the medical examiner/pathologist, is the only person who

24  conducted any autopsy exam of Slater, including an exam of his interior and an exam of

25  his exterior.  (*Id*. at 168:1-12.)

26  / / /

27  / / /

28  / / /

**B.** **Even If Slater Was In A Flat Chest-Down Position For 90 Seconds, This Is An Insufficient Amount Of Time To Cause Death By Asphyxia Which Requires At Least Two Minutes Of Continuous Deprivation Of Air.**

The second fatal flaw in O'Halloran's theory is that even if Slater had been in a flat-down position for 90 seconds, this is an insufficient amount of time to cause unconsciousness and death by asphyxia. O'Halloran has testified that, in order for someone to die by asphyxia, there must be a complete deprivation of air (intake) for at least continuous minutes. (Exhibit A:O'Hall.depo.: 221:24-222:16;230:24-231:6; 233:8-17.) O'Halloran admitted that the position that caused Slater's asphyxia only occurred in the backseat of the patrol car. (*Id*. at 97:25-98:6.) Other than for periods of time when Slater is in the back of the patrol car, except for whatever happened in the back of that patrol car, none of the events, in O'Halloran's opinion, caused the asphyxia that O'Halloran believes was his cause of death. (*Id*. at 100:2-12.)

Based on the Valero Gas Station video of the subject incident, O'Halloran agrees that the following time sequence is correct: At about 1:45:24 a.m., according to camera 15, at composite video marker 37;41;93, deputies applied the second hobble to Slater in the back of the patrol car. (Exhibit A:O'Hall.depo.: 126:13-19.) At about 1:45:25 a.m., according to camera 15, at composite video marker 37:43:00, Deputy Brandt pushed his foot inside the back of the patrol car. (*Id*. at 126:20-25.)  O'Halloran agreed that if, according to camera 15 of the Valero Gas Station video, Deputy Brandt pushed his foot inside the back of the patrol car at approximately 1:45:25, and, if according to that same camera, he removes his foot from the back of the patrol car at approximately 1:46:34, that would be approximately one minute and nine seconds. (*Id*. at 129:10-17.) In terms of a deputy opening the rear driver's side door at approximately 1:47:28 or -:29, O'Halloran agrees that was the final time that door was opened before Slater was removed from the car and subjected to medical treatment. (*Id*. at 131:11-17.)

O'Halloran agrees that according to the Valero incident video, from the time that

1  the hobble is connected to the door and the door is closed on the hobble until Slater is

2  removed from the patrol car for medical aid, at composite video marker 39:05:33

3  through 40:37:50, approximately 90 seconds elapses. (Exhibit A:O'Hall.depo.:133:22-

4  134:10.) **O'Halloran concedes that even with complete air deprivation, 90 seconds**

5  **is insufficient to cause unconsciousness and death by asphyxia**. (*Id*. at 134:11-19.)

6       Based on the above testimony, and the fact that only 90 seconds occurred from

7  the time the second hobble was placed on Slater until he became unresponsive, Dr.

8  O'Halloran's theory of asphyxia lacks evidentiary support under *Daubert*.

9       **C.**     **There Is No Evidence Supporting O'Halloran's Opinion That Slater's**

10       **Vomiting Might Have Contributed To His Asphyxiation Because**

11       **There Is No Evidence At All That Slater Had Any Vomit In His**

12       **Lungs Or Choked Thereon.**

13       The third fatal flaw in O'Halloran's theory is there is no evidence at all that Slater

14  had any vomit in his lungs or choked thereon, thus negating O'Halloran's theory that

15  Slater's vomiting might have contributed to his asphyxiation. Dr. Leticia Schuman, a

16  forensic pathologist with the Riverside County Sheriff Coroner's Bureau, conducted

17  decedent's autopsy on April 16, 2015.  She is the only physician who examined him

18  post-mortem. (Exhibit H:Schuman Dep., 16:6-12; 29:1-4.) Dr. Schuman testified that

19  she documented everything she found during Slater's autopsy on her autopsy report, and

20  there is no record of Dr. Schuman ever finding any vomit in Slater's lungs. (Exhibit

21  H:Schuman Dep., 28:15-23; Exhibit L:Autopsy Report on Joseph Slater prepared by

22  Dr. Schuman dated 4-16-15.) Prior to his death, Dr. Yasmina Boyd treated Slater at St.

23  Bernardine's Hospital.  Although she believes she may have suctioned vomit from

24  Slater's mouth, there is no evidence of any suctioning of any vomit or other substance

25  out of Slater's lungs. (Exhibit M:Boyd depo.: 14:7-15:18; 18:20-19:2; 21:17-25; 23:1-9;

26  23:12-14; 32:10-21; 35:16-25; 37:2-17; 40:3-7.)

27       In O'Halloran's supplemental report dated July 15, 2017, he opines that Slater

28  vomited copiously while he was restrained maximally in the back of the police car.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1   (Exhibit C:7-15-17 Supplemental report, pg. 4.) O'Halloran also opines it was
2   documented by ambulance medics in transit to the hospital as they suctioned vomit out
3   of Slater's airway. (Exhibit A:O'Halloran depo.:176:2-14.)   However, O'Halloran
4   concedes that the ambulance report from the paramedics who transported Slater to the
5   hospital on the night of the incident does not contain the word vomit anywhere in the
6   report. (Exhibit A:O'Halloran depo.:176:15-177:24, citing to Exhibit I:Ambulance
7   Report, Bates Stamp 176-180.) O'Halloran also concedes that the medical records from
8   St. Bernadine's for the treatment of Slater from the night of the incident do not state
9   anywhere specifically that a doctor suctioned vomit out of Slater's airway. (*Id*. at
10  181:21-184:5-9.)

11      Based on the above, Dr. O'Halloran's theory that Slater's vomiting may have
12  contributed to his asphyxiation lacks evidentiary support under *Daubert*.

13  **5.   <u>O'HALLORAN IS NOT QUALIFIED TO TESTIFY ON THE IMPORT</u>**
14  **<u>OF SLATER'S ALLEGED, REPORTED, OR MONITORED HEART</u>**
15  **<u>RHYTHMS.</u>**

16      O'Halloran opines that the final restraint episode likely caused asphyxia with
17  respiratory arrest, loss of consciousness, **subsequent cardiac arrest**, and irreversible
18  anoxic brain damage and the sufficient stressor was respiratory restriction and chest
19  abdominal compression by the way Slater was restrained, causing vomiting with deep
20  aspiration of the vomit. (Exhibit A:O'Hall.depo.56:16-20.) O'Halloran opines that the
21  timing of Slater's vomiting and loss of consciousness soon followed by **a loss of**
22  **cardiac function** all in such close temporal proximity to being in a respiratory
23  compromising position in the back of a police car preceded by a prolonged struggle
24  with deputies argues for a cause-effect relationship. (Exhibit A:O'Hall.depo.56:21-57:7)
25  (Emphasis added.)

26      Halloran lacks sufficient expertise to testify on the import of Slater's alleged,
27  reported, or monitored heart rhythms because: (a) he has never treated a living patient
28  ever, and thus has no experience or expertise in interpreting the import of cardiac

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1    rhythms; and (b) he is not a cardiologist.

2        O'Halloran admitted he is not board certified in toxicology and does not have a

3    degree in toxicology. (Exhibit A:O'Hall.depo.82:25-83:6.) O'Halloran admitted he is

4    not board certified in pharmacology and does not have a degree in pharmacology. (*Id*.

5    at 83:8-12.) O'Halloran admitted he is not board certified in narcotics addiction or

6    narcotics effects. (*Id*. at 83:13-15.) O'Halloran's 7-2-17 report does not list a degree in

7    cardiology.

8        O'Halloran conceded that he previously testified in another case that he never

9    handled a case as a  medical examiner where there was an officer-associated death

10   where he determined a cause of death without examining the decedent's body. (Exhibit

11   A:O'Halloran depo.:166:9-19.) O'Halloran conceded that it is standard practice for a

12   forensic pathologist to examine the body before determining cause of death in such an

13   officer-associated case. (*Id*. at 166:22-167:3.) O'Halloran did not conduct any forensic

14   or laboratory tests on Slater, or any of his body parts and did not examine the body of

15   Slater. (*Id*. at 167:5-17.) In his deposition, O'Halloran refused to admit his previous

16   deposition testimony in which he testified that he has never been a treating physician.

17   (*Id*. at 81:23-82:24.) O'Halloran conceded that Dr. Schuman, the medical

18   examiner/pathologist, is the only person who conducted any autopsy exam of Slater,

19   including an exam of his interior and an exam of his exterior.  (*Id*. at 168:1-12.)

20       Based on O'Halloran's lack of qualifications, his cardiac-related opinions cannot

21   be stated to a reasonable degree of medical certainty and inherently lack adequate

22   factual support, so as to be speculative and inadmissible under Fed. R. Evid. 702

23   precepts.

24

25

26

27

28

**6.**  **THE COURT SHOULD EXCLUDE DR. O'HALLORAN'S OPINIONs THAT SLATER DIED BY ANY FORM OF ASPHYXIA BECAUSE HIS OPINIONS LACK EVIDENTIARY SUPPORT AND DO NOT MEET THE THRESHOLD FOR *DAUBERT* ADMISSIBILITY.**

**A.**  **The *Daubert* Threshold for Expert Opinion Evidence.**

Federal Rules of Evidence, Rule 702, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, in applying Rule 702, the trial court exercises its discretion regarding the admissibility of expert-technical evidence by performing a "'gatekeeping role...to all expert testimony....'" *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1017 (9th Cir. 2004); *see Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 590-592 (1993).  In this regard, it is the trial judge's role as gatekeeper to screen such testimony for relevance and reliability: that is, to make an assessment as to whether the reasoning and methodology underlying the expert testimony is scientifically valid and can be properly applied to the facts at issue. *Daubert*, 509 U.S. at 591-593.  "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question..., the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999)*.  If not, the expert opinion is inadmissible. *Id*.

In addition to being reliable, expert testimony must also be *relevant* in order to be admissible. *Daubert,* 509 U.S. at 589. Whether testimony is relevant depends on

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
*Attorneys at Law*

whether the testimony can properly be applied to assist the trier of fact in understanding and deciding *facts at issue*. *Id.* at 589, 591; *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191-1192 (9th Cir. 2007). Thus, **to meet the relevance standard, expert testimony must be "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"** *Id.* (emphasis added); *see also Daubert v. Merrell Dow Pharms*, 43 F.3d 1311, 1320 (9th Cir. 1995) (in assessing relevance, the court must look to the governing substantive legal standard, and applying California's substantial factor causation standard).

Furthermore, the offering party must show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has **adequate factual and scientific support for that opinion**. *See Daubert*, 509 U.S. at 588-90; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that a court may exclude expert opinion where it deems that the expert's opinion is *not* sufficiently supported by the facts or evidence upon which the expert relies in support of that opinion). In other words, expert testimony is *not* admissible if it is speculative. *See General Elec. Co.*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *cf. Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 771 (2001) ("proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture"; applying a standard similar to *Daubert*).

Where an expert opinion bears primarily on issues of causation of injury, California law (the substantive law applicable here regarding causation as to plaintiffs' state-law claims) requires that a plaintiff establish substantial factor causation by "a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury." *Rutherford v. Owens-Illinois*, 16 Cal.4th 953, 977 (1997) (summarizing part of the substantial factor causation standard); *see* Judicial Council of Cal. Civ. Jury Instructions ("CACI") no. 430. However, in

evaluating whether...[a factor] was a substantial factor in causing...[the injury at issue], the standard should be...is there a reasonable medical probability...that the defendant's conduct contributed to plaintiff's injury." *Lineaweaver v. Plant Insulation Co.*, 31 Cal.App.4th 1409, 1416 (1995). Thus, "[w]hile there are many *possible* causes of any injury, a *possible* cause only becomes *probable* when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was the result of its action." *Id*. (emphasis added). Therefore, under the legal causation standard, a force "which plays only a 'negligible,' 'infinitesimal,' or 'theoretical' part in bringing about an injury, damage or loss is not a substantial factor...." *Kennedy v. Southern Cal. Edison Co.*, 268 F.3d 763, 767-768 (9th Cir. 2001).

Similarly, under federal claim proximate causation standards, to be considered as evidence, medical expert testimony regarding causation must be stated to a reasoanble degree of medical certainty. *See Lajoie v. Thompson*, 217 F.3d 663, 667. fn. 4 (9th Cir. 1999); *Guam v. Reyes*, 879 F.2d 646, 649 (9th Cir. 1988).

As a result, expert opinions are properly excluded if the *Daubert* standard is not satisfied. *See, e.g., Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007) (plaintiff's expert opinion on the effects of TASER ECD deployments was excluded under *Daubert* because the court found plaintiff was not qualified to testify as an expert due to his lack of familiarity with TASER devices and his reliance on only one scholarly article on the effects of TASER ECD deployments).

In other words, to be admissible under *Daubert*, **an expert opinion must have adequate factual and scientific support**: <u>**where the gap between the data-evidence and the expert opinion is too great, the opinion can only be viewed as speculation or conjecture that cannot help the trier of fact, and it is thus inadmissible**</u>. *See General Elec. Co.*, 522 U.S. at 146; *Daubert*, 509 U.S. at 588-590.

### B.   To Be Admissible, A Medical Expert's Opinion Must Be Supported By A Reasonable Degree of Medical Certainty.

"In the context of a motion for summary judgment, an expert must back up his

1   opinion with specific facts." *Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d
2   825, 831 (9th Cir. 2001); *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 700
3   (9th Cir. 1981). "The factual basis for the expert's opinion must be stated in the expert's
4   affidavit and although the underlying factual details need not be disclosed in the
5   affidavit, the underlying facts must exist." *Guidroz, supra*, 254 F.3d at 831; *Bulthius v.*
6   *Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1986).  In *Guidroz, supra*, the Ninth
7   Circuit Court of Appeal upheld a grant of summary judgment and exclusion of
8   plaintiffs' experts' opinions on causation (i.e., that defendant railroad company's
9   engineers failed to keep a proper lookout before a derailment) because plaintiffs'
10  experts failed to set forth factual bases for those opinions.  *Id.* at 827-831.  Specifically,
11  plaintiffs and their experts failed to submit any evidence, "other than speculation or
12  guesswork," that there was something visible at the point of derailment that defendant's
13  engineers would have seen had they been keeping a proper lookout.  *Id.*  Similarly here,
14  plaintiffs are unable to point to any admissible evidence, other than speculation and
15  guesswork, to support an expert opinion that any defendant's conduct was the
16  mechanism of slater's death.

17       As stated above, expert opinion testimony on causation must be stated to a
18  reasonable degree of medical certainty to constituted admissible evidence.   For
19  example, in *Lajoie, supra*, the Ninth Circuit Court of Appeal refused to consider as
20  valid evidence an expert physician's opinion that a victim had suffered repetitive injury
21  because that expert failed to state that opinion to a reasonable degree of medical
22  certainty.  *Lajoie, supra*, 217 F.3d 663 at 667, fn. 4.  The Court concluded that the
23  expert failed to meet this requirement because in stating that opinion he used language
24  such as "may have been," "I guess," "I think," and "most of us feel."  *Id.*  Here, the
25  relevant medical professionals have specifically admitted that they are unable to opine
26  on the mechanism of Slater's death.

27       As set out above, Dr. O'Halloran's opinion that Slater died by positional,
28  compressional, or any other form of asphyxia is based on an improper and unsupported

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

factual foundation. Federal Rules of Evidence Rule 702 allows expert opinion testimony to be admitted <u>only</u> "if (l) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." That standard is not met here. All of Dr. Ron O'Halloran's opinions that Slater died by positional, compressional, or any other form of asphyxia should be excluded on grounds of speculation and insufficient evidentiary support because: (1) There is no evidence that Slater was in a flat chest-down position for more than a few seconds, thus negating the foundational premise of O'Halloran's theory of death by asphyxia; (2) Even if Slater was in a flat chest-down position for 90 seconds, this is an insufficient amount of time to cause death by asphyxia which requires at least two minutes of continuous deprivation of air; and (3) There is no evidence supporting O'Halloran's opinion that Slater's vomiting might have contributed to his asphyxiation, because there is no evidence at all that Slater had any vomit in his lungs or choked thereon.

Furthermore, plaintiffs have not shown that O'Halloran is qualified to render any opinions on the import of Slater's alleged, reported, or monitored heart rhythms. O'Halloran's opinions on the cardiac import to Slater's death should be excluded on the ground that O'Halloran lacks sufficient expertise because: (a) he has never treated a living patient ever, and thus has no experience or expertise in interpreting the import of cardiac rhythms; and (b) he is not a cardiologist. Thus, the cardiac-related opinions of O'Halloran cannot be stated to a reasonable degree of medical certainty and inherently lack adequate factual support, so as to be speculative and inadmissible under Fed. R. Evid. 702 precepts.

/ / /

/ / /

/ / /

/ / /

/ / /

**7.** **CONCLUSION.**

Based on the foregoing, Defendants respectfully request that the honorable Court exclude the following opinions and testimony of Dr. O'Halloran both at trial and in conjunction with Defendants' Motion for Summary Judgment:

(1)    All of Dr. Halloran's opinions that Slater died by positional, compressional, or any other form of asphyxia;

(2)    All of Dr. Halloran's opinions on the import of Slater's alleged, reported, or monitored heart rhythms.

DATED:  August 14, 2017          **MANNING & KASS**
                                 **ELLROD, RAMIREZ, TRESTER LLP**

By:    _____/s/ Tony M. Sain_____
          Eugene P. Ramirez, Esq.
          Tony M. Sain, Esq.
        Attorneys for Defendants,
        COUNTY OF SAN BERNARDINO, et al.