LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (SBN 144074)
E-mail: dalekgalipo@yahoo.com
Tanya Sukhija (SBN 295589)
E-mail: tsukhija@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

LAW OFFICE OF JAMES S. TERRELL
James S. Terrell, Esq. (SBN 170409)
Email: jim@talktoterrell.com
15411 Anacapa Road
Victorville, CA 92392
Tel: (760) 951-5850
Fax: (760) 952-1085

LAW OFFICE OF SHARON J. BRUNNER
Sharon J. Brunner, Esq. (SBN 229931)
Email: sharonjbrunner@yahoo.com
14393 Park Avenue, Suite 100
Victorville, CA 92392
Tel: (760) 243-9997
Fax: (760) 843-8155

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLA SLATER AND DAMIEN SLATER, individually and as successors in interest, by and through their Guardian ad Litem Sandra Salazar; TINA SLATER AND DAVID BOUCHARD, individually;<br><br>                    Plaintiffs,<br><br>vs.<br><br>DEPUTY SHANDON DEASEY; DEPUTY PETER GENTRY; DEPUTY GARY BRANDT; SGT. MIKE RUDE; COUNTY OF SAN BERNARDINO; and DOES 1-10, INCLUSIVE.<br>                    Defendants. | Case No. 5:16-CV-01103-JFW-KK<br><br>[Hon. John F. Walter]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT WITNESS DR. RONALD O'HALLORAN**<br><br>[Declaration of Tanya Sukhija and Declaration of Ronald O'Halloran with exhibits filed concurrently herewith]<br><br>Date: September 11, 2017<br>Time: 1:30 p.m.<br>Courtroom: 7-A<br><br>Trial date: October 17, 2017<br>Pre-Trial Conf.: September 25, 2017 |

-i-

# **TABLE OF CONTENTS**

**PAGE**

I.   INTRODUCTION ............................................................. 1

II.   LEGAL STANDARD ....................................................... 2

III.   ARGUMENT ................................................................... 4

  A. Defendants' Motion to Exclude Opinions of Dr. O'Halloran is a
     Disguised Attempt at a Second Motion for Summary Judgment. .... 4

  B. Dr. O'Halloran's Opinions that Slater Died by Positional, Compressional,
     or Any Other Form of Asphyxia Are Relevant, Supported by Sufficient
     Evidence, and Are Not Speculative. .................................. 5

     1. The Evidence, Including the Video, and the Officer-Defendants' Own
       Admissions, Indicates that Mr. Slater was in a Chest-Down Position
       for Nearly Five Minutes. ........................................ 6

     2. The Evidence, Including the Autopsy Photos, Indicates that the
       Officer-Defendants Placed Their Body Weight on Mr. Slater's Back
       When He Was in a Chest-Down Position. Further, the Three Hobbles
       Kept Tension on Mr. Slater's Legs and Put More Pressure on Mr.
       Slater's Stomach and Chest. .................................... 11

     3. Dr. O'Halloran's Opinion that Mr. Slater's Vomiting Contributed to
       his Asphyxiation is Supported by Evidence that Mr. Slater Had Vomit
       in his Airway. ................................................. 12

  C. Dr. O'Halloran Has Sufficient Expertise and the Requisite Qualifications
     to Opine that Mr. Slater Died of Asphyxia and to Opine on the
     Significance of Mr. Slater's Heart Rhythms. ......................... 13

     1. Dr. O'Halloran Practiced Forensic Pathology for 40 Years. .... 14

     2. Dr. O'Halloran's Opinions are the Products of Reliable
       Principles and Methods Because He Specializes in Asphyxial
       Deaths. ...................................................... 16

-ii-

3. Dr. O'Halloran Is Capable of Understanding and Interpreting the Autopsy Findings Notwithstanding that He Did Not Conduct the Autopsy Himself; In Fact, Dr. O'Halloran's Findings May be More Accurate than the Coroner/Medical Examiner's Findings Because Dr. O'Halloran Had More Information About the History and Circumstances of the Death Available to Him.   17

4. Dr. O'Halloran's Opinions on Mr. Slater's Heart Rhythms are the Products of Reliable Principles and Methods. A Physician Need Not be Board-Certified in Cardiology to Accurately Interpret the Simple Cardiac Function Issues in Mr. Slater's Case.   20

D. Dr. O'Halloran's Opinions are Supported by a Reasonable Degree of Medical Certainty.   21

E. Precluding Dr. O'Halloran from Offering the Foregoing Opinions Would Prejudice Plaintiffs.   22

IV.   CONCLUSION   23

1

## **TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Bonner v. ISP Technologies, Inc.*, 259 F. 3d 924 (8th Cir. 2001) ...............................4

4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ...............2, 3, 4

5

*Feliciano-Hill v. Principi*, 439 F.3d 18(1st Cir. 2006)..................................................4

6

*Humetrix v. Gemplus*, 268 F.3d 910 (9th Cir. 2001) ....................................................4

7

*In re Viagra Products Liability Litigation*, 572 F. Supp. 2d 1071 (D. Minn. 2008)...4

8

*Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013 (S.D. Ohio 1999).....................15

9

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ..................................2, 14

10

*Mendoza v. City of West Covina*, 206 Cal. App. 4th 702 (2012) ..............................15

11

*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187 (9th Cir. 2007)..............................5

12

*Tofano v. Reidel*, 61 F. Supp. 2d 289 (D.N.J. 1999) ..................................................15

13

<u>Statutes</u>

14

Federal Rules of Civil Procedure, Rule 702 ....................................................2, 3, 6 14

15

Federal Rules of Civil Procedure, Rule703 ...........................................................3, 6

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **MEMORANDUM OF POINTS AND AUTHORITIES**

2 | **I.   INTRODUCTION**

3 | In this civil rights case, Plaintiffs, who are the surviving heirs of

4 | Joseph Slater ("Mr. Slater"), seek damages against Defendants County of San

5 | Bernardino, Deputies Shannon Deasey, Peter Gentry, Gary Brandt, and Sergeant

6 | Mike Rude (collectively referred to hereinafter as "the officer-defendants") for the

7 | individual officer-defendants' use of excessive force against Mr. Slater, which

8 | caused his death. The officer-defendants placed Mr. Slater in the patrol car in a

9 | chest-down position while his legs were hobbled and connected to his handcuffs,

10 | after which the officer-defendants applied two more hobbles. To assist the jury in

11 | understanding the consequences of the officer-defendants' conduct in this case,

12 | Plaintiffs have retained Dr. Ronald O'Halloran, a physician certified by the

13 | American Board of Pathology in the medical specialty of anatomic pathology and

14 | the subspecialty of forensic pathology. In brief, Dr. O'Halloran's opinions in this

15 | case are as follows: Mr. Slater died because of asphyxia while being restrained by

16 | the officer-defendants; had Mr. Slater not been restrained the way he was, he would

17 | not have died that day; Mr. Slater's death would more accurately be classified as a

18 | "homicide" on his death certificate and the cause of death more properly attributed

19 | to asphyxia by aspiration of vomit during law enforcement restraint procedures.

20 | Because Defendants dispute that Mr. Slater's death was caused by asphyxia, Dr.

21 | O'Halloran's specialized knowledge is relevant and helpful to the jury.

22 | Defendants now bring a motion to exclude Dr. O'Halloran's opinion that Mr.

23 | Slater died by asphyxia on the grounds of speculation and insufficient evidentiary

24 | support. Defendants' motion also seeks to exclude Dr. O'Halloran's opinions on the

25 | significance of Mr. Slater's heart rhythms on the ground that Dr. O'Halloran lacks

26 | sufficient expertise. Plaintiffs oppose Defendants' motion on the following grounds:

27 | First, Defendants' Motion is a disguised attempt at a second motion for summary

28 |

-1-

judgment, and exclusion of Dr. O'Halloran should not be based on highly disputed facts. Second, Dr. O'Halloran's opinions that Mr. Slater died by asphyxia are supported by sufficient evidence—including the surveillance video and the officer-defendants' own statements—that Mr. Slater was in a chest-down position for nearly five minutes and that certain of the officer-defendants placed pressure and/or their body weight on Mr. Slater. Third, Dr. O'Halloran's opinion that Mr. Slater's vomiting contributed to his asphyxiation is supported by evidence that Mr. Slater had vomit in his airway. Fourth, Dr. O'Halloran has sufficient expertise to opine on the significant of Mr. Slater's heart rhythms and on Mr. Slater's cause of death—Dr. O'Halloran has reviewed close to 100 cases where people have died from being restrained in a prone position, including being hogtied by police officers. These opinions are relevant and reliable under Federal Rule of Civil Procedure, Rule 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) because they are sufficiently tied to the facts at issue and are offered with a reasonable degree of medical certainty.

Although Plaintiffs request that this Court deny Defendant's Motion, if this Court is inclined to grant Defendant's motion, Plaintiffs would respectfully request a *Daubert* hearing so as to properly permit the parties and the Court to examine Dr. O'Halloran as to his qualifications on these issues.

## II.   LEGAL STANDARD

The gatekeeping requirement of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is to ensure the reliability and relevancy of expert testimony; "it is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Court must assess (1) the expert's qualification to present the opinions offered, (2)

-2-

"whether the reasoning or methodology underlying the testimony is scientifically valid," and (3) "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  The focus of this inquiry "must be solely on principles and methodology, not on the conclusions they generate."  *Id*. at 595.  In analyzing whether specific testimony was admissible, such testimony must be both relevant (helpful to the jury) and reliable. *Daubert*, 509 U.S. at 589, 591-92.  This gatekeeper function applies to all expert testimony, not just testimony based in science. *Kumho*, 526 U.S. at 138.

Additionally, in order to assess the expert's qualification to present the opinions offered, the Court looks to Federal Rules of Civil Procedure, Rules 702 and 703.  *Id*. at 592.

Federal Rules of Evidence, Rule 702, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Federal Rules of Evidence, Rule 703, provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

While expert opinions must be reliable, a trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate

-3-

proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho*, 526 U.S. at 152. Defendants cannot use this standard to exclude an expert's opinions just because they disagree with the expert or the expert's opinions are unfavorable to their position. *See Feliciano-Hill v. Principi*, 439 F.3d 18, 25 (1st Cir. 2006) ("The mere fact that two experts disagree is not grounds for excluding one's testimony."); *Bonner v. ISP Technologies, Inc.*, 259 F. 3d 924, 930 (8th Cir. 2001) ("Although it is common that medical experts often disagree on diagnosis and causation, questions of conflicting evidence must be left for the jury's determination."); *In re Viagra Products Liability Litigation*, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) ("only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595; *see also Humetrix v. Gemplus*, 268 F.3d 910, 919 (9th Cir. 2001) (Defendants' "recourse is not exclusion of the testimony, but, rather, refutation of it by cross-examination and by the testimony of [their] own expert witnesses.").

## III.   ARGUMENT

### A. Defendants' Motion to Exclude Opinions of Dr. O'Halloran is a Disguised Attempt at a Second Motion for Summary Judgment.

Defendants filed a motion for summary judgment (Dkt. #66) concurrently with their motion to exclude opinions of Dr. O'Halloran. In their motion to exclude opinions of Dr. O'Halloran, Defendants essentially re-argue the issues presented in their motion for summary judgment, including arguments that Mr. Slater was not in a chest-down position for more than a few seconds. Whether Mr. Slater was in a chest-down position for more than a few seconds, the length of time that Mr. Slater was in a chest-down position, whether the officer-defendants placed pressure and/or

-4-

1  their body weight on Mr. Slater, and Mr. Slater's cause of death are all disputed

2  issues of fact that should be determined by a jury. As set forth in Plaintiffs'

3  opposition to Defendants' motion for summary judgment, the Court must view all

4  evidence in a light most favorable to the non-moving party, and all justifiable

5  inferences are to be drawn in favor of the non-moving party. Exclusion of Dr.

6  O'Halloran should not be based on highly contest facts; rather, it should be left to

7  the jury to determine which set of facts they believe and, based on those facts, which

8  experts they believe. The Court should deny Defendants' motion to exclude

9  opinions of Dr. O'Halloran on this ground and hold that the proper way for

10 Defendants to challenge the bases of Dr. O'Halloran's opinions is through rigorous

11 cross-examination at trial.

12  **B. Dr. O'Halloran's Opinions that Slater Died by Positional,**

13  **Compressional, or Any Other Form of Asphyxia Are Relevant,**

14  **Supported by Sufficient Evidence, and Are Not Speculative.**

15  Defendants first argue that Dr. "O'Halloran's theory of asphyxia lacks

16 evidentiary support because . . . [t]here is no evidence that Slater was in a flat chest-

17 down position for more than a few seconds" and no evidence that the officer-

18 defendants caused Mr. Slater to "asphyxiate by placing him in a chest-down position

19 in the back seat of the patrol car, and by placing their body weight on him in that

20 position." (Def. Mot. at 4:13-17). Plaintiffs disagree; to the contrary, the evidence

21 set forth in detail below establishes that Mr. Slater was in a chest-down position for

22 nearly five minutes and that the officer-defendants placed their body weight on Mr.

23 Slater when Mr. Slater was in a chest-down position. This evidence provides a solid

24 foundation for Dr. O'Halloran's opinions. Dr. O'Halloran's opinions that Mr. Slater

25 died of asphyxia are relevant because they are "sufficiently tied to the facts of the

26 case that it will aid the jury in resolving a factual dispute." *Stilwell v. Smith &*

27 *Nephew, Inc.*, 482 F.3d 1187, 1191-92 (9th Cir. 2007). In the instant case,

28

-5-

Defendants dispute that Mr. Slater died of asphyxia. Accordingly, Dr. O'Halloran's scientific knowledge on asphyxia is directly helpful to the jury in resolving this dispute. Dr. O'Halloran's opinions are based on surveillance video capturing the officer-defendants actions with regard to Mr. Slater and the officer-defendants' own statements, making Dr. O'Halloran's opinions that Mr. Slater died of asphyxia relevant and "sufficiently tied to the facts."

Moreover, an expert witness is permitted to rely on hypothetical information, meaning that Dr. O'Halloran entitled to render opinions based on his understanding of the set of facts provided to him. Through cross examination, Defendants are free to present hypotheticals or a different version of the facts to interrogate Dr. O'Halloran's opinions. Further, Federal Rule of Evidence, Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

### 1. The Evidence, Including the Video and the Officer-Defendants' Own Admissions, Indicates that Mr. Slater was in a Chest-Down Position for Nearly Five Minutes.

The video evidence, coupled with the officer-defendants' initial statements and deposition testimony by the officer-defendants and paramedic Todd Beard, indicates that Mr. Slater was in a chest-down position for nearly five minutes. Defendants appear to argue that Mr. Slater was in a chest-down position for a maximum of 90 seconds. (Def. Mot. at 12:15-13:4). Plaintiffs dispute the timeline Defendants present in their Motion, wherein Defendants isolate the relevant timeframe to the 90 seconds after the final hobbles were applied. (*Id.*). From Plaintiffs' perspective, the applicable timeline begins with the third and final time that Mr. Slater was placed in the police car at 1:43:32 a.m. and ends when Mr. Slater

-6-

1  was finally removed from the police car at 1:48:14 a.m. (Surveillance Video at
2  Camera 15, attached to the Declaration of Tanya Sukhija in Opposition to
3  Defendants' Motion to Exclude Opinions of Plaintiffs' Expert Witness Dr. Ronald
4  O'Halloran ("Sukhija Decl.") as "Exhibit 10").

5         The officer-defendants placed Mr. Slater in the car for a third and final time at
6  1:43:32 a.m. ("Exhibit 10" to Sukhija Decl. (Surveillance Video at Camera 15)). In
7  each of their initial statements—which the officer-defendants gave within 24 hours
8  after the incident when the incident was fresh in their minds—the officer-defendants
9  stated that Mr. Slater was placed in the car chest down. (Initial Statement of
10 Shannon Deasey ("Deasey Initial Statement"), attached to Sukhija Decl. as "Exhibit
11 1" at 52:24-53:8, 103:14-25, 150:4-12; Initial Statement of Michael Rude ("Rude
12 Initial Statement"), attached to Sukhija Decl. as "Exhibit 2" at 12:17-24, 43:16-23;
13 Initial Statement of Gary Brandt ("Brandt Initial Statement"), attached to Sukhija
14 Decl. as "Exhibit 3" at 40:5-15; Initial Statement of Peter Gentry ("Gentry Initial
15 Statement"), attached to Sukhija Decl. as "Exhibit 4" at 12:15-22, 34:4-11, 46:5-13).
16 Further, all four officer-defendants testified at their depositions that when Mr. Slater
17 was placed in the patrol car a third and final time, Mr. Slater was positioned chest-
18 down. (Deposition of Shannon Deasey ("Deasey Depo."), attached to Sukhija Decl.
19 as "Exhibit 5" at 64:7-65:12, 108:20-109:9; Deposition of Peter Gentry ("Gentry
20 Depo."), attached to Sukhija Decl. as "Exhibit 6" at 42:16-24; Deposition of
21 Michael Rude ("Rude Depo."), attached to Sukhija Decl. as "Exhibit 7" at 68:25-
22 69:19; Deposition of Gary Brandt ("Brandt Depo."), attached to Sukhija Decl. as
23 "Exhibit 8" at 32:7-22, 40:8-24). Paramedic Todd Beard also testified at his
24 deposition that the officer-defendants placed Mr. Slater in the patrol car face down.
25 (Deposition of Todd Beard ("Beard Depo."), attached to Sukhija Decl. as "Exhibit
26 9" at 52:18-55:8). Deputy Deasey also testified that after Mr. Slater was placed in
27 the car the final time, Mr. Slater pushed his feet against the passenger-side rear
28

-7-

window while he was on his stomach. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 52:19-53:7; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 104:18-105:15; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 70:7-20; "Exhibit 5" to Sukhija Decl. (Deasey Depo.) at 109:10-110:19; "Exhibit 3" to Sukhija Decl. (Brandt Initial Statement) at 40:5-15).

The surveillance video shows that at 1:45:15 a.m., Deputy Gentry leaned into the driver-side rear door to apply the second hobble for about 30 seconds. ("Exhibit 10" to Sukhija Decl. (Surveillance Video) at Camera 8). The video also shows that the officer-defendants closed the patrol car door at approximately 1:46:51 a.m. (*Id.*). Mr. Beard testified that Mr. Slater was still face down when the officer-defendants finally got Mr. Slater positioned to where they could close the patrol car doors; in other words, Mr. Slater was still on his chest at 1:46:51 a.m., more than three minutes after he was placed in the car chest-down. ("Exhibit 9" to Sukhija Decl. (Beard Depo.) at 52:18-55:8; "Exhibit 10" to Sukhija Decl. (Surveillance Video)). Substantiating this evidence, Deputy Gentry stated that after the third hobble was applied and the patrol car door was closed, Mr. Slater was on his stomach. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 14:10-20, 56:1-9; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 52:7-53:4; 76:18-77:11; "Exhibit 7" to Sukhija Decl. (Rude Depo.) at 117:15-118:4).

Deputy Gentry stated that after the third hobble was applied and the vehicle door was closed, he *planned* to reposition Mr. Slater onto his left side and put a seatbelt on Mr. Slater because he "didn't want to transport [Mr. Slater] laying [sic] flat on his stomach," further substantiating that Mr. Slater was in a chest-down position. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 14:10-20, 53:14-21, 64:8-17, 65:3-24; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 53:6-55:6, 70:25-71:12, 78:15-79:14). Simply put, Mr. Slater could not have been in any other position. Deputy Gentry stated that he put his knee across Mr. Slater's shoulders or

-8-

left rib area. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 10:2-5, 10:20-23, 34:17-20, 35:14-18, 35:20-36:10, 54:24-55:5; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 14:13-15:6; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 12:4-6, 91:3-15). Deputy Gentry's knee could not have made contact with that part of Mr. Slater's back if Mr. Slater were on his side as opposed to his chest. Similarly, Deputy Brandt stated that he put his right foot against Mr. Slater's left shoulder while Mr. Slater was in the car. ("Exhibit 3" to Sukhija Decl. (Brandt Initial Statement) at 41:7-10). If Mr. Slater were on his side, it is unlikely that Deputy Brandt could have put his foot on Mr. Slater's shoulder, because Mr. Slater's face would have been in the way. Further, Deputy Brandt stated that as soon as the patrol car door was shut, Mr. Slater's feet were straight up in the air, further substantiating that Mr. Slater was on his chest. ("Exhibit 3" to Sukhija Decl. (Brandt Initial Statement) at 40:5-12).

At approximately 1:48:14 a.m., the officer-defendants removed Mr. Slater from the car for the final time, approximately four minutes and 42 seconds after Mr. Slater was placed face-down in the patrol car. ("Exhibit 10" to Sukhija Decl. (Surveillance Video) at Camera 8). Combined with the video evidence, Deputy Deasey's testimony also supports that Mr. Slater was on his chest for nearly five minutes. Deputy Deasey testified that it took about one minute for Deputy Gentry to attach the second hobble, another 30 seconds to a minute for him to attach the third hobble, and that another a minute passed from the time the door was closed on the final hobble, to the time Slater appeared to stop breathing or lose consciousness. ("Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 109:23-110:7, 112:17-24, 151:5-9, 154:9-14, 160:15-20; "Exhibit 5" to Sukhija Decl. (Deasey Depo.) at 77:19-78:10, 79:11-13, 79:14-81:5, 84:20-25, 110:23-111:12, 123:17-25, 129:6-10, 131:18-132:23). Deputies Gentry and Brandt stated that when they realized Mr. Slater was unconscious, Mr. Slater was *still on his stomach*. ("Exhibit 4" to Sukhija

-9-

Decl. (Gentry Initial Statement) at 14:10-15:9; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 54:3-58:10; "Exhibit 3" to Sukhija Decl. (Brandt Initial Statement) at 52:17-53:4).

Defendants state repeatedly in their motion that Mr. Slater was not in a *flat* chest-down position. Plaintiffs respond that one does not need to be in a completely flat position to asphyxiate; even if Mr. Slater were slightly tilted on his side but still largely chest down, the way in which he was restrained and hog-tied could nonetheless have interfered with his ability to breathe and does not exclude positional and/or restraint asphyxia as the cause of death. (Declaration of Ronald O'Halloran, M.D. ("O'Halloran Decl.") at ¶ 23; Deposition of Ronald O'Halloran ("O'Halloran Depo."), attached to Sukhija Decl. as "Exhibit 11" at 214:6-15). Moreover, a person does not need to be in a particular position that causes inability to breathe for at least two minutes. (O'Halloran Decl. at ¶ 22). For example, someone could get partially asphyxiated by a position they are restrained in, and to the point where they lose consciousness and lose control of their bodily functions, vomit, aspirate the vomit, and die from the vomit blocking their airway or ability to breathe. (*Id*.). In this case, Mr. Slater's left nostril was pressed up against the backseat of the patrol car, and the right nostril and face was leaning against the seat, interfering with his ability to breathe. ("Exhibit 7" to Sukhija Decl. (Rude Depo.) at 106:5-20; "Exhibit 2" to Sukhija Decl. (Rude Initial Statement) at 52:18-22; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at ~~152:8-11,~~ 157:6-13, 160:1-2). It is possible that Slater may have lost consciousness from the asphyxia position he was in, and having vomited, also due to the asphyxia position he was in, that sealed his fate of a death by asphyxia. (O'Halloran Decl. at ¶ 22).

//

//

1

2. **The Evidence, Including the Autopsy Photos, Indicates that the Officer-Defendants Placed Their Body Weight on Mr. Slater's Back When He Was in a Chest-Down Position. Further, the Three Hobbles Kept Tension on Mr. Slater's Legs and Put More Pressure on Mr. Slater's Stomach and Chest.**

The evidence, including the autopsy photos and the officer-defendants' own admissions, also indicates that certain of the officer-defendants placed pressure and their body weight on Mr. Slater's back. (O'Halloran Decl. at ¶¶ 20, 21; 2 Autopsy Photos, attached to Sukhija Decl. as "Exhibit 15"). Deputy Gentry stated that when the first hobble was applied, Mr. Slater was on his stomach and Deputy Gentry had his right knee across Slater's shoulder blades and was using his body weight to hold Mr. Slater down. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 10:2-5, 10:20-23, 34:17-20, 35:14-18, 35:20-36:10; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 14:13-15:6; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 12:4-6, 91:3-15). Deputy Gentry also stated that at the time he was applying the second hobble, he put some pressure on Mr. Slater's backside with his right knee. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 54:24-55:5; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 76:8-16). Deputy Gentry and paramedic Todd Beard both stated that at the time Deputy Gentry was applying the second hobble to Mr. Slater's legs, Mr. Slater was on his stomach. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 53:14-54:23; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 74:16-76:6; "Exhibit 9" to Sukhija Decl. (Beard Depo.) at 79:12-80:6). Abrasions and bruising on Mr. Slater's left upper back are consistent with Deputy Brandt's description of holding Mr. Slater in place on the car seat with his right boot/shoe. (O'Halloran Decl. at ¶ 21; "Exhibit 15" to Sukhija Decl. (2 Autopsy Photos)). A bruise on Slater's right mid-back over the chest area may correspond to

-11-

Deputy Gentry's description of kneeling on Mr. Slater in the car while applying the second hobble. (*Id.*) This likely contributed to Mr. Slater's asphyxiation. (*Id.*)

Further, the video shows that the three-hobble connection was pulled upward through the top of the door on the rear driver side of the patrol car and pulled tightly. ("Exhibit 10" to Sukhija Decl. (Surveillance Video) at Camera 15). The video shows that the patrol car door sealed the third hobble, keeping tension on the legs. (*Id.*). Further, the officer-defendants testified that Mr. Slater's legs were pulled tightly. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 48:19-22, 56:23-57:2; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 77:9-11; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 151:19-152:2; "Exhibit 5" to Sukhija Decl. (Deasey Depo.) at 46:21-47:25, 81:22-82:9; "Exhibit 7" to Sukhija Decl. (Rude Depo.) at 71:5-73:4). Once the hobbles were applied and pulled through the door, Mr. Slater could no longer move and was fully restrained. ("Exhibit 4" to Sukhija Decl. (Gentry Initial Statement) at 14:10-14, 55:21-25, 59:5-10; "Exhibit 6" to Sukhija Decl. (Gentry Depo.) at 50:7-19; "Exhibit 3" to Sukhija Decl. (Brandt Initial Statement) at 44:25-45:2; "Exhibit 8" to Sukhija Decl. (Brandt Depo.) at 44:25-45:4; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 14:23-15:5, 54:16-23, 108:24-109:3, 109:16-19; "Exhibit 5" to Sukhija Decl. (Deasey Depo.) at 81:15-21). Pulling Mr. Slater's ankles and knees higher shifted Mr. Slater's own body weight to his stomach and chest, which increased the chances for vomiting. ("Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 205:6-22; "Exhibit 1" to Sukhija Decl. (Deasey Initial Statement) at 153:1-3; "Exhibit 5" to Sukhija Decl. (Deasey Depo.) at 121:19-122:24).

//

//

-12-

### 3.  Dr. O'Halloran's Opinion that Mr. Slater's Vomiting Contributed to his Asphyxiation is Supported by Evidence that Mr. Slater Had Vomit in his Airway.

The paramedics documented that as they transported Mr. Slater to the hospital, they attempted to remove vomit from the back of Mr. Slater's oral cavity and beginning of the esophagus and larynx. (O'Halloran Decl. at ¶¶ 18).  As reflected in Detective De La Torre's investigative report and summary of his interview with Dr. Yasmina Boyd, Dr. Boyd observed vomit in and around the oral area of Mr. Slater's face. (*Id.*; Deposition of Yasmina Boyd ("Boyd Depo."), attached to Sukhija Decl. as "Exhibit 12" at 17:8-17; Detective De La Torre's Investigative Report ("De La Torre Report"), attached to Sukhija Decl. as "Exhibit 13"). Detective De La Torre's report also notes that Dr. Boyd stated that she inserted an endotracheal tube[1] to clear Mr. Slater's airway. (O'Halloran Decl. at ¶ 18; "Exhibit 13" to Sukhija Decl. (De La Torre Report)). Given the context of the case and the interview, the only substance to clear from Mr. Slater's airway (trachea and bronchi of lungs) would be vomit. (*Id.*). Dr. Yasmina Boyd, the emergency medicine physician who attended to Mr. Slater in the emergency room, documented in the emergency department chart that Mr. Slater had vomit in his airway when he arrived at the hospital after the incident. ("Exhibit 12" to Sukhija Decl. (Boyd Depo.) at 20:21-22:14). Moreover, it is a reasonable inference that the paramedics had suctioned out the majority of the vomit prior to Mr. Slater's arrival at the hospital.

//

---

[1] Typically, once an endotracheal tube is inserted a suction tube can be inserted into it and used to suction fluids (in this case, vomit) out of the trachea and bronchi. (O'Halloran Decl. at ¶ 18).

-13-

**C. Dr. O'Halloran Has Sufficient Expertise and the Requisite Qualifications to Opine that Mr. Slater Died of Asphyxia and to Opine on the Significance of Mr. Slater's Heart Rhythms.**

**1.  Dr. O'Halloran Practiced Forensic Pathology for 40 Years.**

Federal Rules of Evidence, Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. *See Kumho*, 526 U.S. at 1178 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Dr. O'Halloran has the requisite experience and qualifications to opine that Mr. Slater died of asphyxia and to opine on the significance of Mr. Slater's heart rhythms. Dr. O'Halloran has extensive knowledge, training and experience in evaluating and determining what caused a particular death, which is the central issue in Mr. Slater's case. (*See generally* O'Halloran Decl.). Dr. O'Halloran has been a medical doctor since 1977, has been a licensed physician since 1978, and was the chief medical examiner at the Ventura County Coroner's Office from 1985 to 2013. (O'Halloran Decl. at ¶ 5; "Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 25:18-26:2). For 40 years, Dr. O'Halloran practiced the diagnostic specialties of anatomic pathology (mostly surgical pathology and hospital autopsy pathology) and forensic pathology (medical-legal cause of death determination and autopsy pathology). (O'Halloran Decl. at ¶ 6). Practicing forensic pathology includes integrating medical information and circumstantial information to formulate a probable cause of death, sometimes with an autopsy, and sometimes without an autopsy. (*Id.*). Throughout his career, Dr. O'Halloran has personally performed over 8,000 autopsies and has Dr. O'Halloran has also personally prepared, signed and attested to the cause of death as the medical examiner on the medical-legal death certificate in excess of 20,000 times as a medical examiner in Oregon and in California during his career. (O'Halloran Decl. at ¶ 8).

Dr. O'Halloran is well-qualified, relies on sound medical conclusions, and possesses the requisite specialized knowledge and training to assist the trier of fact in determining probability of death by restraint asphyxia. His proffered testimony is therefore admissible.  *See*, *e.g.*, *Tofano v. Reidel*, 61 F. Supp. 2d 289, 295-96 (D.N.J. 1999) (holding that a doctor could testify that three police officers had contributed to an arrestee's asphyxial death through placement in a prone position); *Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013, 1016-17 (S.D. Ohio 1999) (permitting Dr. O'Halloran to testify about his published study on agitated delirium with restraint). Dr. O'Halloran has testified as an expert on forensic pathology approximately 800 times, including in the case *Mendoza v. City of West Covina*, 206 Cal. App. 4th 702 (2012), where Dr. O'Halloran was permitted to testify that the decedent died of restraint asphyxiation based on his understanding of the facts. (O'Halloran Decl. at ¶ 8). Additionally, in the case *Tara Garlick, et al. v. County of Kern, et al.*, an asphyxia case, Judge Lawrence O'Neil denied the defendants' motion *in limine* to exclude Dr. O'Halloran, calling the motion "spurious." (Judge O'Neil's Order re Motions in Limine in *Garlick v. County of Kern* ("Order"), attached to Sukhija Decl. as "Exhibit 16" at 10:10-18). In that case, where cause of death was at issue, Judge O'Neil held that Dr. O'Halloran's opinions were "within the realm of factual dispute and is well within the province of the trier of fact." (*Id.*). This Court should likewise deny Defendants' motion to exclude Dr. O'Halloran's opinions in Mr. Slater's case, where the cause of Mr. Slater's death is a factual dispute for the trier of fact. Even Defendants' counsel Mr. Sain conceded during Dr. O'Halloran's deposition that "we all know he's qualified," indicating that Defendants' instant challenge of Dr. O'Halloran is a disingenuous attempt to exclude opinions that are unfavorable to their case. ("Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 200:16-19).

//

//

-15-

### 2.  Dr. O'Halloran's Opinions are the Products of Reliable Principles and Methods, In Part Because He Specializes in Asphyxial Deaths.

Applying his substantial experience, knowledge, research, and his review of the evidence, Dr. O'Halloran opines that the probable cause of Mr. Slater's death was asphyxia. (O'Halloran Decl. at ¶¶ 2-14). Among other things, Dr. O'Halloran bases his opinion on the fact that the heart and brain need a fairly continuous supply of oxygen to be able to function undamaged. (*See generally* "Exhibits 83 and 84" to O'Halloran Decl.). Further, it is well accepted that inhibition of respiration and/or inhibition of blood flow caused by too much weight on the back for too long can cause asphyxia. (O'Halloran Decl. at ¶ 20). For more than 25 years, Dr. O'Halloran has had a special interest in the subject of fatal asphyxia and sudden in-custody deaths temporally associated with restraint procedures, and most of Dr. O'Halloran's scientific published papers have been on the topic of asphyxial deaths. (O'Halloran Decl. at ¶ 10). Dr. O'Halloran has studied the phenomenon, written scientific published papers on the subject, and lectured about it in county, state and national conference forums. (*Id*.). During his career, Dr. O'Halloran has personally autopsied approximately five to ten restraint-related deaths within his jurisdiction as a medical examiner, and has consulted on more than 80 restraint-related deaths in other jurisdictions. (*Id*.). Dr. O'Halloran has reviewed in detail close to 100 cases where people have died from being restrained in a prone position, including being hogtied by police officers. (O'Halloran Decl. at ¶ 11; "Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 201:3-9).

//

//

//

-16-

### 3. Dr. O'Halloran Is Capable of Understanding and Interpreting the Autopsy Findings Notwithstanding that He Did Not Conduct the Autopsy Himself; In Fact, Dr. O'Halloran's Findings May be More Accurate than Dr. Schuman's Findings Because Dr. O'Halloran Had More Information About the History and Circumstances of the Death Available to Him.

Defendants take issue with the fact that Dr. O'Halloran did not personally perform Mr. Slater's autopsy. (Def. Mot. at 11:11-12). This is a baseless argument because Defendants themselves have retained three medical experts to opine on Mr. Slater's cause of death, none of whom personally conducted Mr. Slater's autopsy. Moreover, one does not need to do the autopsy oneself to understand and interpret the autopsy findings. (O'Halloran Decl. at ¶ 7). At the time of an autopsy, a detailed autopsy report is prepared and numerous photographs are taken to document what was observed during the autopsy. (*Id.*). Deaths legally investigated and autopsied by coroner/medical examiners are by their very nature frequently subject to legal scrutiny and litigation, and it is routinely expected that the coroner/medical examiner's autopsy findings and cause of death opinions will be examined critically by other experts and evaluated in court. (*Id.*). In his decades of providing private consultations on deaths, Dr. O'Halloran consulted on close to 100 cases where people have died from being restrained in a prone position, including hogtied by police. (O'Halloran Decl. at ¶ 11). In those cases, Dr. O'Halloran did not personally conduct the autopsy; rather, he reviewed and relied on the coroner/medical examiner's observations, the autopsy report, and the autopsy photographs. (*Id.*). In virtually all of those cases, Dr. O'Halloran had *more* information about the history and circumstances of the officer-involved death available to him compared to the information available to the coroner/medical examiner conducting the autopsy. (*Id.*). The same is true in Mr. Slater's case, where Dr. O'Halloran applied these principles

-17-

and methods accepted in the field of forensic pathology.

It is crucial that the coroner/medical examiner understand the detailed factual circumstances of the incident surrounding a person's death to evaluate whether asphyxia was a cause of death. (O'Halloran Decl. at ¶ 28). In fact, the coroner/medical examiner's opinion about the cause of death in a particular case is not necessarily more accurate than the opinion of a consultant forensic pathologist reviewing the case after the autopsy has been conducted. (*Id*.). In a case like Mr. Slater's where Dr. Leticia Schuman (the coroner/medical examiner who performed Mr. Slater's autopsy) was provided with very little detail about the circumstances of the death, a consulting forensic pathologist's opinion about the cause of death may actually be *more* accurate than the opinion of the coroner/medical examiner. (*Id*.). Dr. Schuman did not watch the surveillance video capturing this incident, nor did Dr. Schuman review the officer-defendants' statements prior to conducting the autopsy and determining the cause of death. (*Id*.; Deposition of Leticia Schuman ("Shuman Depo."), attached to Sukhija Decl. as "Exhibit 14" at 109:11-16). In his report, Detective De La Torre noted that he did not have information about the position in which Mr. Slater was restrained or the length of time for which Mr. Slater was restrained. ("Exhibit 13" to Sukhija Decl. (De La Torre Report)). Because the only information Dr. Schuman had aside from her own observations was De La Torre's report, it is clear that Dr. Schuman had less information about the circumstances surrounding Mr. Slater's death compared with the information available to Dr. O'Halloran. ("Exhibit 14" to Sukhija Decl. (Shuman Depo.) at 30:3-19, 109:11-16).

Along these lines, Defendants argue that Dr. O'Halloran did not give adequate weight to Dr. Schuman's conclusions. (Def. Mot. at 11:11-12). However, Dr. Schuman's determination that there was no evidence of positional asphyxia during Mr. Slater's autopsy is not significant because there is usually no direct

-18-

evidence of asphyxiation, and Mr. Slater's autopsy is consistent with such asphyxia cases. (O'Halloran Decl. at ¶ 29). Furthermore, Dr. Schuman's familiarity with positional asphyxia and restraint asphyxia deaths is limited—Dr. Schuman testified in her deposition that she is primarily familiar with asphyxia relating to hangings, strangulation, suffocation, and smoke inhalation—and she does not even believe that a person's body position or manner in which a person is restrained can cause asphyxia. ("Exhibit 14" to Sukhija Decl. (Shuman Depo.) at 57:2-6, 99:5-15, 100:8-141, 100:24-101:5). Dr. Schuman's only support for her belief that a person's body position or manner in which a person is restrained cannot cause asphyxia is a single article by "Chan et al.," presumably Defendants' expert Theodore Chan. (*Id.*).

Moreover, Dr. O'Halloran does not simply dismiss Dr. Schuman's determination on the cause of death. Large portions of Dr. O'Halloran's Report are devoted to both the physical and scientific evidence supporting his cause-of-death opinions. ("Exhibits 83 and 84" to O'Halloran Decl. (O'Halloran Reports)). Dr. O'Halloran explains in his Initial Report that methamphetamine can cause death by inducing cardiac arrhythmias and cardiac arrest, but that Mr. Slater still had a pulse when he was already unconscious and not breathing, so the methamphetamine in his system is an improbable explanation for his loss of consciousness, his respiratory arrest, and his vomiting. ("Exhibit 83" to O'Halloran Decl. (O'Halloran Initial Report) at page 7, ¶ 3). Dr. O'Halloran's Reports provide an in-depth review of the causal mechanisms in restraint asphyxia situations and carefully applies the theory to the evidence in this case, including the statements and testimony of the officer-defendants and physicians, the surveillance videos, and the autopsy photos documenting abrasions on Mr. Slater's back. (*Id.*). In forming his opinions, Dr. O'Halloran also relied on the timing of Mr. Slater losing consciousness and going unresponsive, which occurred after the second or third hobble was applied. (O'Halloran Depo. at 212:12-213:8).

**4. Dr. O'Halloran's Opinions on Mr. Slater's Heart Rhythms are the Products of Reliable Principles and Methods. A Physician Need Not be Board-Certified in Cardiology to Accurately Interpret the Simple Cardiac Function Issues in Mr. Slater's Case.**

Interpreting cardiac signs, symptoms, and tests are a frequent part of the weekly work routine of a practicing forensic pathologist. (O'Halloran Decl. at ¶ 12). Dr. O'Halloran's years of general medical training and over four decades of anatomic and forensic pathology experience and training qualify him to interpret information and data about cardiac function and loss of cardiac function. (*See Id.*). Defendants contend that Dr. O'Halloran does not have sufficient expertise to testify on the import of Mr. Slater's heart rhythms because he has never treated a living patient[2] and because he is not a cardiologist. (Def. Mot. at 14:26-28). This is irrelevant to Dr. O'Halloran's ability to offer opinions regarding Mr. Slater's death (and inaccurate, as Dr. O'Halloran treated living patients during medical school) because Dr. O'Halloran was specifically retained to opine on Mr. Slater's cause of death and analyze Mr. Slater's death. (O'Halloran Decl. at ¶ 14). There is also no evidence that Dr. Schuman herself has experience treating live patients. A forensic pathologist by nature analyzes the circumstances of a death to determine the cause of death, making Dr. O'Halloran's analysis of Mr. Slater's heart rhythms well within his expertise. (O'Halloran Decl. at ¶ 6). Further, many of the cases Dr. O'Halloran's handled during his 40-year career as a forensic pathologist involved heart disease and cardiac arrhythmia evaluations, and Dr. O'Halloran has carefully dissected more than 9,000 hearts during his practice. (O'Halloran Decl. at ¶ 9).

---

[2] Dr. O'Halloran treated living patients during medical school. There is also no evidence that Dr. Schuman has treated living patients.

With respect to Defendants' criticism that Dr. O'Halloran is not a cardiologist, the "cardiac rhythm" in question in Slater's death case is simply Mr. Slater's pulse felt by a paramedic after he was removed from the police car after becoming unresponsive while restrained in the police car. (O'Halloran Decl. at ¶ 27). A physician does not have to be board-certified in cardiology to accurately interpret the simple cardiac function issues in this case, and interpreting heart rhythms based on the medical records and testimony of the paramedics in conjunction with specialized knowledge and scientific analysis is a reliable and accepted method. (*Id*.). There is also no evidence that any of Defendants' three medical experts—each of whom offer opinions about Mr. Slater's cause of death— are board-certified cardiologists, emphasizing the weakness in Defendants' argument. Dr. O'Halloran certainly understands the significance of the paramedic finding a patient's pulse—it means the patient's heart is beating and still pumping blood through the patient's body. (O'Halloran Decl. at ¶ 26; "Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 212:1-11). A beating heart means that the patient is not in a fatal arrhythmia. (*Id*.). That observation implicates asphyxia as the probable cause of the loss of consciousness and subsequent failure of the heart and other organs that caused death, as opposed to cardiac arrhythmia as the probable initiating cause of death. (*Id*.).

### D. Dr. O'Halloran's Opinions are Made to a Reasonable Degree of Medical Certainty.

Dr. O'Halloran's opinions are far from—as Defendants suggest— "speculation and guesswork." (Def. Mot. at 19:13-16.). Dr. O'Halloran does not offer "possibilities'; rather, he clearly opines that asphyxia was the probable cause of Mr. Slater's death. "The **probable** trigger for Slater's vomiting and ultimately for his asphyxia death was likely the effects of the way he was being restrained prone, hogtied and compressed even more by the pressure on his back by two deputies."

-21-

1  ("Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 55:14-19). "The nearly

2  simultaneous loss of consciousness and vomiting when the added . . . compression

3  and hobbling occurred argues strongly for a cause-effect relationship

4  physiologically." ("Exhibit 11" to Sukhija Decl. (O'Halloran Depo.) at 56:1-5).

5  Even if other factors contributed to Mr. Slater's death, in no way was the hobbling,

6  and face-down positioning, and compression, of Mr. Slater a "negligible,"

7  infinitesimal," or "theoretical" factor in causing Mr. Slater's death. (Def. Mot. at

8  18:8-9; O'Halloran Decl. at ¶ 19). Importantly, Dr. O'Halloran testified that all of

9  his opinions were made to a reasonable degree of medical certainty. ("Exhibit 11" to

10  Sukhija Decl. (O'Halloran Depo.) at 75:20-24, 76:9-13).

11      **E. Precluding Dr. O'Halloran from Offering the Foregoing Opinions**

12         **Would Prejudice Plaintiffs.**

13        It would be unduly prejudicial and unfair to Plaintiffs if Dr. O'Halloran were

14  prohibited from testifying. Defendants retained not just one, but three experts, as

15  well as a rebuttal expert, who render opinions regarding Slater's cause of death.

16  Defendants retained Dr. Theodore Chan to opine that Mr. Slater's death was not

17  caused or contributed to by asphyxia. (Def. Mot. at 7:22-24). If this Court were to

18  grant Defendants' instant motion to preclude Dr. O'Halloran from opining that Mr.

19  Slater's death was caused by asphyxia as a result of the manner in which the officer-

20  defendants restrained him, Plaintiffs would have no way of rebutting Dr. Chan's

21  opinions. Defendants also retained Dr. Richard Clark to opine that

22  methamphetamine most likely caused Mr. Slater to suffer an irregular heart rhythm

23  and cardiac arrest. (Def. Mot. at 7:8-15). Again, if this Court were to exclude Dr.

24  O'Halloran from opining on the significance of Mr. Slater's heart rhythms, Plaintiffs

25  would have no way of rebutting Dr. Clark's opinions. Defendants also retained Dr.

26  Richard Ruffalo to opine that "excited delirium" is the more precise description of

27  Mr. Slater's cause of death. (Def. Mot. at 7:18). Plaintiffs and Dr. O'Halloran

28

1  disagree with each of the foregoing experts' opinions, but would have no way of

2  rebutting these contentions if this Court were to preclude Dr. O'Halloran—

3  Plaintiffs' only retained medical expert rendering opinions regarding the cause of

4  death—from testifying at trial that asphyxia caused Mr. Slater's death. Accordingly,

5  if this Court is inclined to exclude Dr. O'Halloran's opinions at trial, Plaintiffs

6  request that this Court also exclude Defendants' medical experts. None of

7  Defendants' medical experts conducted Mr. Slater's autopsy, none of Defendants'

8  medical experts are cardiologists, and defense expert Dr. Ruffalo relies on a theory

9  (excited delirium) that is not supported by scientific evidence or recognized by the

10  American Medical Association.

11  **IV.    CONCLUSION**

12      For the foregoing reasons, Plaintiffs respectfully request that this Court deny

13  Defendants' Motion to Exclude Opinions of Plaintiffs' Expert Witness Dr. Ronald

14  O'Halloran in its entirety. As set forth above, Dr. O'Halloran's opinions are the

15  product of reliable principles and methods reliably applied. Dr. O'Halloran reviewed

16  the facts of this case, including statements and testimony by the officer-defendants,

17  paramedics, and the medical examiner. Dr. O'Halloran reviewed in detail the

18  surveillance video, the autopsy report and autopsy photographs and gave adequate

19  weight to Dr. Schuman's findings. Dr. O'Halloran examined the medical records

20  and determined that Mr. Slater lost consciousness and stopped breathing before his

21  pulse stopped. This is a reliable method of determining, in conjunction with Dr.

22  O'Halloran's review of the evidence, that a person died of asphyxia. It is beyond

23  dispute that Dr. O'Halloran is eminently qualified to offer opinions that Mr. Slater

24  died of asphyxia and to offer opinions on the significance of Mr. Slater's heart

25  rhythms, given his 40 years of experience as a forensic pathologist and his specialty

26  in handling nearly 100 asphyxia cases. If this Court is inclined to grant Defendants'

27  Motion, Plaintiffs respectfully request that this Court hold a *Daubert* hearing to

28

-23-

1  evaluate Dr. O'Halloran's qualifications and also strongly consider exclusion of

2  Defendants' medical experts.

3

4  DATED:  August 25, 2017          LAW OFFICES OF DALE K. GALIPO
                                    LAW OFFICE OF SHARON J. BRUNNER
5                                   LAW OFFICE OF JAMES S. TERRELL

6

7                                   By  /s/ Dale K. Galipo
                                        Dale K. Galipo
8                                       Tanya Sukhija
                                        Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-