Exhibit "1"



June 16, 2017

Tony M. Sain, Esq
Manning & Kass, Ellrod, Ramirez, Trester, LLP
15th Floor at 801 Tower
801 South Figueroa Street
Los Angeles, Ca. 90017

RE: Salazar, et al v. County of San Bernardino, et al: Case No. 5:16-CV-01103-JFW-KK

Dear Mr. Sain:

### 1. Overview and Summary of Experience.

Per your request and pursuant to Federal rule of Civil Procedure 26, I have written (see below) a summary of my opinions regarding the above case.

My opinions are based upon my knowledge, experience and training as a Clinical Pharmacologist, Anesthesiologist, and an Assistant Clinical Professor of Anesthesiology at the David Geffen/UCLA School of Medicine and a former Assistant Professor of Pharmacy and Pharmacology at the U.S.C. School of Pharmaceutical Sciences. In addition, I am a Fellow of the American Collage of Clinical Pharmacology.

As a practicing physician and clinical pharmacologist, I act as a consultant to emergency room (ER) physicians, critical care specialists and other physicians regarding the diagnosis, treatment and management of numerous drug(s) overdoses, intoxication, multiple drug-drug interactions and patient's underlying pathophysiology and how it might affect both diagnosis and treatment.

### 2. Records-Information Reviewed or Considered.

In formulating my opinions regarding the specific issues of this case, I have relied upon my knowledge of the medical/pharmacological and toxicological literature and my experience in diagnosing and treating patients similar to the decedent in this case. I have also relied on the hard copy materials regarding the case including: Sheriff's Department reports, the Fire department report, the AMR reports, the Riverside County Sheriff-Coroner investigator's report, the autopsy report, and toxicology report, the amended Death Certificate, the St. Bernardine Medical Center ER report, the interviews of multiple witnesses (Deputy Sheriffs, Fire Dept. responders, AMR responders, various other eye witnesses, and family members of the decedent) the deposition of Leticia Schuman, M.D., forensic pathologist and video recording.

I am informed and believe that I have received all disclosures and discovery responses produced in the case, as well as all deposition transcripts that have been completed prior to the date of this report. The foregoing list underscores those records to which I devoted substantial consideration. In the event that

any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.

The extended list of records is as follows:

| | |
|---|---|
| 1. | COSB Uniform Crime Report DOI 04/15/15 by Detective Mooradian dated 04/27/15 **Bate Stamp No. COSB 00001** |
| 2. | COSB Detailed History for Police Inc. #HI15050007 DOI 04/15/15 **Bate Stamp Nos. COSB 00002 - 00004** |
| 3. | Death in Custody Reporting Form data supplied by Detective Mooradian dated 04/15/15 **Bate Stamp No. COSB 00005** |
| 4. | COSB Assignment/Arrival by Officer M. Brandt dated 04/15/15 **Bate Stamp No. COSB 00006** |
| 5. | COSB Notification by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00007** |
| 6. | COSB Arrival by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00008** |
| 7. | COSB Briefing by Detective Mooradian dated 04/22/15 **Bate Stamp Nos. COSB 00009 – 00010** |
| 8. | COSB Crime Scene Description by Detective Mooradian dated 04/22/15 **Bate Stamp Nos. COSB 00011 – 00013** |
| 9. | COSB Placard Description by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00014** |
| 10. | COSB Placard Measurements by Detective Mooradian dated 04/22/15 **Bate Stamp Nos. COSB 00015 – 00016** |
| 11. | COSB Hobble Recovery by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00017** |
| 12. | COSB Neighbor Contacts by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00018** |
| 13. | COSB Scene closure by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00019** |
| 14. | COSB Confidential Report re: Witnesses E. Cowell and D. Hosch by Detective Mooradian dated 04/22/15 **Bate Stamp No. COSB 00020** |
| 15. | COSB Confidential Report re: Suspect and Medical Personnel by Detective De La Torre dated 04/22/15 **Bate Stamp Nos. COSB 00021 - 00022** |
| 16. | COSB Evidence Property Report CD of Interviews dated 04/15/15 by Deputy M. Brandt **Bate Stamp No. COSB 00023** |
| 17. | COSB Evidence Property Report |

|     | |
| --- | --- |
|     | Google earth photos used during interviews dated 04/18/15 by Detective Mike Flores<br>**Bate Stamp No. COSB 00024** |
| 18. | COSB Evidence Property Report Hobble Restraint dated 04/20/15 by CSS C. Fostore dated 04/20/15<br>**Bate Stamp No. COSB 00025** |
| 19. | COSB Evidence Property Report Evidence collected at the Valero Gas Station dated 04/21/15 by Deputy S. Seavy<br>**Bate Stamp Nos. COSB 00026 – 00027** |
| 20. | COSB Evidence Property Report<br>Illustrations by Sgt. Rude and Deputy Gentry dated 04/23/15 by Detective Steers<br>**Bate Stamp No. COSB 00028** |
| 21. | COSB Evidence Property Report<br>Physical evidence collected during post mortem exam dated 05/04/15 by Deputy Martinez<br>**Bate Stamp Nos. COSB 00029 – 00030** |
| 22. | COSB Evidence Property Report<br>One latent card dated 06/09/15 by Deputy Seavey<br>**Bate Stamp No. COSB 00031** |
| 23. | COSB Evidence Property Report<br>Medication for analysis and destruction dated 08/31/15 by Detective De La Torre<br>**Bate Stamp No. COSB 00032** |
| 24. | COSB Evidence Property Report<br>Photos and surveillance video dated 08/31/15 by Detective Mooradian<br>**Bate Stamp No. COSB 00033** |
| 25. | COSB Scientific Investigations Division Priority Assignments for Criminalistics Evidence Exam dated 05/27/15 by Elena Bezdek Supervising Criminalist<br>**Bate Stamp No. COSB 00034** |
| 26. | COSB Scientific Investigations Division Report Type Latent and Evidence Processing dated 06/11/15<br>**Bate Stamp Nos. COSB 00035 – 00036** |
| 27. | COSB Scientific Investigations Division Latent Print Section<br>One latent not suitable for comparison<br>**Bate Stamp No. COSB 00037** |
| 28. | COSB Scientific Investigations Division Report Type crime scene and evidence processing dated 05/21/15<br>**Bate Stamp Nos. COSB 00038 – 00041** |
| 29. | COSB Request for Analysis<br>Description – oblong pills<br>DOI 04/15/15<br>**Bate Stamp No. COSB 00042** |
| 30. | DMV CALPHOTO re: Joseph Slater<br>**Bate Stamp No. COSB 00043** |

| 31. | COSB Confidential Report re: S Joseph Manning Slater dated 07/08/15 by Detective Mooradian |
| --- | --- |
|  | Bate Stamp No. COSB 00044 |
| 32. | COSB Confidential Report re: IP Peter Michael Gentry dated 07/09/15 by Detective Steers |
|  | Bate Stamp No. COSB 00045 |
| 33. | COSB Confidential Report re: IP Michael Lawrence Rude dated 07/09/15 by Detective Steers |
|  | Bate Stamp No. COSB 00046 |
| 34. | COSB Confidential Report re: IP Kevin William Merrill dated 07/09/15 by Detective Steers |
|  | Bate Stamp No. COSB 00047 |
| 35. | COSB Confidential Report re: W Kathleen Bouchard dated 07/09/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00048 |
| 36. | COSB Confidential Report re: W Anna Marie Wear, Jared Bouchard, Paul Dimarino, Manuel Lucero, Sandra Salazar dated 07/10/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00049 |
| 37. | COSB Confidential Report re: W Daniel Hosch and RP Edward Cowell dated 08/05/15 by Officer M. Brandt |
|  | Bate Stamp No. COSB 00050 |
| 38. | COSB Notification to on call Detective J. Steers dated 07/09/15 |
|  | Bate Stamp No. COSB 00051 |
| 39. | COSB witness interview re: Kathleen Bouchard dated 07/10/16 by Detective Mooradian |
|  | Bate Stamp No. COSB 00052 |
| 40. | COSB witness interview re: Matthew Bouchard dated 07/10/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00053 |
| 41. | COSB witness interview re: Dan Joseph Hosch dated 07/10/15 by Detective Mooradian |
|  | Bate Stamp Nos. COSB 00054 – 00055 |
| 42. | COSB witness interview re: Edward Cowell dated 07/10/15 by Detective Mooradian |
|  | Bate Stamp Nos. COSB 00056 – 00058 |
| 43. | COSB witness interview re: Anna Wear dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00059 |
| 44. | COSB witness interview re: Jared Bouchard dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00060 |
| 45. | COSB witness interview re: Sandra Salazar dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00061 |
| 46. | COSB witness interview re: Paul DiMarino dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00062 |
| 47. | COSB witness interview re: Manuel Lucero dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp No. COSB 00063 |
| 48. | COSB witness interview re: Kevin William Merrill dated 07/13/15 by Detective Mooradian |
|  | Bate Stamp Nos. COSB 00064 – 00066 |

| | | |
|---|---|---|
| 49. | COSB Summary of Surveillance Video dated 07/20/15 by Detective De La Torre **Bate Stamp Nos. COSB 00067 - 00071** | |
| 50. | COSB Paramedic Interview Steven Vallez dated 07/20/15 by Detective De La Torre **Bate Stamp Nos. COSB 00072 - 00073** | |
| 51. | COSB Paramedic Interview Corey Lenzen dated 07/20/15 by Detective De La Torre **Bate Stamp Nos. COSB 00074 - 00075** | |
| 52. | COSB EMT Interview Jose Arias dated 07/20/15 by Detective De La Torre **Bate Stamp No. COSB 00076** | |
| 53. | COSB Notification to on call detective De La Torre dated 07/20/15 **Bate Stamp No. COSB 00077** | |
| 54. | COSB EMT interview Brendon Vail dated 07/22/15 by Detective De La Torre **Bate Stamp Nos. COSB 00078 – 00079** | |
| 55. | COSB Firefighter Cal Fire interview Todd Beard dated 07/22/15 by Detective De La Torre **Bate Stamp Nos. COSB 00080 – 00084** | |
| 56. | COSB witness interview Tina Slater dated 08/04/15 by Detective Mooradian **Bate Stamp No. COSB 00085** | |
| 57. | COSB residence search 26968 Messina St., Highland search of Slater's personal property dated 08/31/15 by Detective De La Torre **Bate Stamp No. COSB 00086** | |
| 58. | COSB Autopsy Report by County of Riverside Joseph Slater Autopsy # 2015-04017 dated 07/08/15 by Detective Mooradian **Bate Stamp Nos. COSB 00087 – 00098** | |
| 59. | Sheriff – Coroner County of Riverside Autopsy Protocol Decedent – Joseph Slater **Bate Stamp Nos. COSB 00099 - 00104** | |
| 60. | COSB – Report of Death Worksheet – Joseph Slater **Bate Stamp Nos. COSB 00105 - 00109** | |
| 61. | COSB Scientific Investigations Division Report on the Exam of Controlled Substances **Bate Stamp No. COSB 00110** | |
| 62. | Bio Tox Laboratories results re: J. Slater Specimen Blood dated 04/27/15 **Bate Stamp No. COSB 00111** | |
| 63. | Bio Tox Laboratories results re: J. Slater Specimen urine dated 05/05/15 **Bate Stamp No. COSB 00112** | |

| 64. | Bio Tox Laboratories results re: J. Slater<br>Specimen vitreous dated 04/30/15<br>**Bate Stamp No. COSB 00113** |
|---|---|
| 65. | Bio Tox Laboratories results re: J. Slater<br>Specimen vitreous dated 04/30/15<br>**Bate Stamp No. COSB 00114** |
| 66. | COSB Scientific Investigations Division crime scene and evidence processing dated 07/01/15 by Analyst Carol Fostore<br>**Bate Stamp Nos. COSB 00115 - 00117** |
| 67. | COSB Involved Person Processing Deputy Shannon Deasey dated 07/10/15 by Detective Flores<br>**Bate Stamp Nos. COSB 00118 – 00124** |
| 68. | COSB Involved Person Processing Deputy Pete Gentry<br>dated 07/09/15 by Detective Steers<br>**Bate Stamp Nos. COSB 00125 – 00136** |
| 69. | COSB Summary of Deputy Gentry's Belt Recording dated 09/04/15<br>by Detective Mooradian<br>**Bate Stamp Nos. COSB 00137 – 00138** |
| 70. | Google Earth overview aerial photo<br>**Bate Stamp No. COSB 00139** |
| 71. | COSB Involved Person Processing Deputy Gary Brandt dated 07/10/15 by Detective Flores<br>**Bate Stamp Nos. COSB 00140 – 00145** |
| 72. | COSB Involved Person Processing Deputy Michael Rude dated 07/09/15 by Detective Steers<br>**Bate Stamp Nos. COSB 00146 – 00154** |
| 73. | Google Earth overview aerial photo<br>**Bate Stamp Nos. COSB 00155** |
| 74. | COSB Summary of Deputy Deasey's Belt Recording dated 09/04/15<br>by Detective Mooradian<br>**Bate Stamp Nos. COSB 00156 – 00158** |
| 75. | COSB Hospital Observation dated 07/20/15 by Detective De La Torre<br>**Bate Stamp Nos. COSB 00159 – 00163** |
| 76. | COSB Hospital Response Interview of Dr. Yasmina Boyd dated 07/22/15 by Detective De La Torre<br>**Bate Stamp No. COSB 00164** |
| 77. | St. Bernardine Medical Center Emergency Department Orders<br>dated 04/15/15<br>**Bate Stamp No. COSB 00165** |
| 78. | St. Bernardine Medical Center Emergency Department Chart<br>dated 04/15/15<br>**Bate Stamp Nos. COSB 00166 – 00167** |

| 79. | St. Bernardine Medical Center Emergency Department Triage Assessment dated 04/15/15 |
| --- | --- |
|  | **Bate Stamp Nos. COSB 00168 – 00170** |
| 80. | St. Bernardine Medical Center Patient Care Record dated 04/15/15 |
|  | **Bate Stamp Nos. COSB 00171 – 00175** |
| 81. | American Medical Response Prehospital Care Report dated 04/15/15 |
|  | **Bate Stamp Nos. COSB 00176 – 00180** |
| 82. | COSB Disposition Report Property Release |
|  | Case Books delivered to Highland Station dated 12/01/15 |
|  | **Bate Stamp No. COSB 00181** |
| 83. | CLETS printout re: Joseph Manning Slater |
|  | **Bate Stamp Nos. COSB 00182 – 00189** |
| 84. | CD – Audio |
|  | Belt Recordings (Deputy Deasey and Deputy Gentry) |
|  | Dispatch |
|  | Detective Flores |
|  | Detective Mooradian |
|  | Detective Steers |
|  | **Bate Stamp No. COSB 00190** |
| 85. | CD – Images |
|  | Autopsy Photos |
|  | Flores Google images |
|  | Google overhead image of scene |
|  | Hospital and deputies photos |
|  | Photos taken by deputies |
|  | Scene photos |
|  | Photos of decedent's shirt |
|  | **Bate Stamp No. COSB 00191** |
| 86. | CD – Valero Gas Station Surveillance Video |
|  | **Bate Stamp No. COSB 00192** |
| 87. | Detective DeLaTorre audio interviews |
| 88. | Valero surveillance video |
|  | DVR 1/Cameras 4, 12, and 15 |
|  | DVR 2/Cameras 2, 6, and 8 |
| 89. | Deposition of Paramedic Todd Beard with exhibits |
| 90. | Deposition of witness Edward Cowell with exhibits |
| 91. | Deposition of witness Paul DiMarino with exhibits |
| 92. | Deposition of witness Manuel Lucero with exhibits |
| 93. | Deposition of Dr. Leticia Schuman with exhibits |
| 94. | Deposition of Paramedic Brandon Vail |
| 95 | Deposition of Paramedic Steve Vallez |
|  | Other witness depositions as available. |

### 3.      Right to Supplement.

Except as noted, my opinions and testimony will be to a reasonable degree of medical certainty. If additional pertinent information is revealed and provided to me subsequent to this letter, my opinions may change.

### 4.      Factual Summary.

This summary is provided for convenience and does not necessarily itemize every single fact relied upon in the formation of my opinions/conclusions in this matter. This is based on my review of the aforementioned records and materials. I do not contend to have direct personal knowledge of the incident facts.

Briefly, on Wednesday, April 15, 2015 at approximately 0110 hours (ie, 1:10 AM), Joseph Slater (Slater) was a noticed by an employee of the Valero gas station/mini store who called 911 to report a "tweaker" running around outside and tampering/removing wires from the emergency shut off switch. The surveillance video confirms this as well as showing that Slater also ripped an advertisement off the wall. Slater is then recorded as walking to the front of the store and is noted to be staring at a bright/blinking LED business sign and talking to himself. The Valero employee stated in his interview that Slater was wearing a white t-shirt and noted that Slater was sweating profusely and it was cold outside. The Valero employee could hear Slater talking to himself and saying random words, and he noticed Slater was also staring at the LED advertisement screen and appeared mesmerized by it.

The employee stated that shortly thereafter, a deputy arrived and approached Slater and was talking to him slowly. The deputy then handcuffed Slater slowly and walked him back to the patrol vehicle. Slater willingly walked to the patrol car and the deputy was able to get Slater to sit in the driver's side rear seat. The subject (Slater) was initially calm while talking to the deputy. Then it appeared that the subject (Slater) started to become agitated. The Valero employee noticed that Slater started kicking at the deputy, trying to push his way out of the patrol vehicle, and that Slater was able to roll out of the vehicle. The deputy held Slater angled on his side upon the ground, with his knee on Slater's shoulder, and the deputy held Slater's legs down with his hands. Slater was kicking and trying to escape. The deputy stayed at the patrol vehicle until 2 other police cars arrived.

Deputy Deasey was the first law enforcement responder on the scene that the Valero employee noticed. Deputy Deasey's interview noted that upon his initial encounter with Slater he recognized him from previous calls. Deasey called Slater by name asking him to walk towards him: he observed Slater watching a television inside the store from outside the building and noted Slater appeared in a mesmerized state and was unresponsive to Deasey's commands. Deasey handcuffed Slater behind his back to prevent him from possibly resisting arrest. Deasey noted Slater displaying objective symptoms of being under the influence of a drug. Deasey asked Slater to sit down in the back seat of his patrol car several times, as Slater was yelling at Deasey saying that someone was going to kill him. Deasey explained to Slater he was trying to get him medical assistance and that he (the deputy) was not going to harm him. Slater began kicking Deasey and Deasey ordered him to stop kicking or he was going to spray him with oleoresin capsicum (OC, also referred to as pepper spray). But Slater continued to kick Deasey. Deasey then sprayed Slater's face with OC. Slater further resisted by pushing himself out of the vehicle, and Slater was able to rush toward Deasey. Deasey was able to grab Slater's arm and shoulder

and took him to the ground, largely onto his side. Once on the ground, Slater continued to resist by kicking his legs and attempting to stand up. Deasey advised dispatch that Slater was resisting arrest.

Deputy Gentry then arrived at the scene and noticed Slater was lying on the ground his hands handcuffed behind his back, laying on his side, while Deasey was using both hands to try to control Slater while Slater was kicking his legs, twitching his head and upper body in a jerking motion, trying to get free from Deasey. Gentry attempted to help Deasey control Slater. Slater was yelling out irrational statements, including miscellaneous numbers and random names of subjects who were not present.

Gentry also recognized Slater from prior contacts and had remembered previously being told by other deputies that Slater was unusually strong when under the influence of a controlled substance. Gentry told Deasey to get the hobble restraint from his car while Gentry was trying to restrain Slater. Slater continued to kick at Gentry in an attempt to assault Gentry. Deasey attempted to place the hobble restraint on Slater's legs. At about that time, Sergeant Rude arrived on the scene. Rude assisted Deasey in placing the hobble restraint around Slater's legs and an attempt was made to connect the hobble back to the handcuffs. Rude noticed that Slater was yelling "Jesus" and random numbers and not making any sense in what he was saying. Rude believed Slater was under the influence of a large amount of methamphetamine or possibly bath salts.

Deasey then requested dispatch to have emergency medical service respond to the scene to assess Slater. A fire engine arrived shortly after the hobble restraint was placed. Gentry noted that Slater was irrational and that Slater would escalate (by yelling, screaming, and jerking his body) and de-escalate his behavior at random times.

Deputy Brandt then arrived at the scene when Slater became calm enough to be able to sit up and allow the fire department paramedics to examine Slater. Rude overheard one of the paramedics' state that Slater's pulse was 160.

Per the interview with Mr. Todd Beard the (Cal Fire) fire dept. paramedic, he indicated that his partner (Brock Frasier) was unable to take Slater's pulse due to Slater moving his fingers and hands, fidgeting, and moving around, and because Slater would not sit still and was shouting for help saying he was being beaten even though no beating was occurring. In addition, Frasier was unable to get a blood pressure and pulse oximetry reading due to Slater's continuously moving his extremities. Beard was able to locate a pulse and said it was a high pulse rate and that Slater's behavior was consistent with being under the influence of a controlled substance. The rest of Slater's vital signs were relatively normal and there were no signs Slater needed immediate medical attention.

Rude advised that Slater needed to be decontaminated from being pepper sprayed. Rude and Gentry picked up Slater and walked him over to the gas station's water hose, where they decontaminated Slater's head and face by washing him with water. Slater was saying they were placing gasoline on him at the time. Beard also noted that, while the deputies were trying to decontaminate Slater, Slater appeared to be resisting, moving his head and shouting that they were pouring gas on him. During the decontamination, Slater was sitting on his knees for over 1 minute.

After Slater was decontaminated, Brandt and Gentry then carried Slater back to the rear of Deasey's patrol car and were going to secure him in the back seat. Rude stated that as Slater got closer to the rear

9

of the car, Slater began to move his body up and down and "flop around like a fish out of water." The deputies were trying to place Slater in the back seat, but Slater continued to be agitated and kicking and squirming – somehow managing to straighten out his hobbled legs. Beard saw Slater kick at the deputies with his legs and that Slater was not allowing the deputies to put him inside the vehicle.

Per the Cal Fire department paramedic, Todd Beard, an unknown deputy opened the right rear door and reached inside, pulling Slater further into the back seat. As this was occurring, Beard was standing behind the trunk of the car about 10 feet away. Beard stated that after the doors were shut, Slater continued to kick his feet. The sergeant (Rude) said that Slater needed to be seat belted. Beard stated that a deputy opened the door and attempted to put a seat belt on Slater. Slater immediately tried to get out of the car by attempting to stand up. Another deputy helped to prevent Slater from getting out. Slater continued to kick forcefully toward the deputies, who were trying to push Slater's legs back inside the vehicle. Another deputy opened the other door and helped pull Slater back inside. Beard stated that Slater slid across the back seat and was pulled completely out of the vehicle. Beard noted only one hobble strap and saw the deputies trying to adjust it. Slater was then picked up and placed back inside the vehicle head first. Slater was lying on his stomach on the back seat. According to the deputies, Slater's position on his stomach on the back seat was canted or angled: so that Slater was primarily laying on his left side/shoulder, and was only flat on his chest or stomach briefly and for no more than 3 seconds. According to the deputies, no deputies put any of their body weight on Slater's torso while he was in the back seat.

Rude stated the following in his interview: Slater was lying slightly on the back seat with his head towards the driver's side and his feet up, towards his buttocks. Slater was lying slightly on his left side with his head down and canted toward the cage. Slater's hands were still handcuffed behind his back. Slater's face was not smothered and he was able to breathe. He and Gentry closed the driver's side and passenger door. Rude stated he was standing at the rear of the patrol vehicle and noticed that Slater was no longer talking or moving around in the back of the vehicle. Rude asked Gentry to look into the vehicle and make sure Slater was still breathing. Gentry stated he heard 2 large breaths and saw vomit near Slater's mouth. Gentry could not tell if Slater was still breathing. Rude and Gentry took Slater out of the vehicle and placed him on his side. The firefighters remained at the scene and the paramedics immediately began to check Slater and could not find a pulse.

From the interview with Deputy Gentry he stated the following: Gentry had placed a second hobble strap onto Slater's ankles and Deasey attached that to a third hobble attached to mesh cage area in the front cabin. Slater was lying with the lower half of his body flat on the rear seat, but his torso was on its side. Slater's left shoulder and left side of his chest was in the crease from back seat and bottom cushion. Slater's face was turned upward to where he was looking at the rear cage and the right side of his chest was up in the air, allowing Slater to breathe. Slater was still talking and yelling incoherently while Gentry was in the back of the vehicle. Gentry remained at the rear driver's side door next to Deasey and was looking at the rear passenger seat watching Slater. Gentry closed the door with the intention of going back into the back seat and securing Slater in a seated position with the seat belt. Gentry took approximately 5 to 7 seconds to catch his breath and was going to discuss what the next plan of action was. While watching Slater in the back seat of the vehicle, Deasey believed Slater had

vomited. Gentry looked in the area where Slater's mouth was and saw vomit. Gentry immediately went to the rear passenger side door and began pulling Slater out of the vehicle with Deasey, Rude, and Brandt. Gentry saw Slater take a couple shallow breaths. Gentry shook Slater's upper torso and heard Slater take 2 deep breaths. Gentry then assisted in taking Slater out of the rear of the vehicle so that the paramedic could assess Slater again. The paramedic connected the medical apparatus to Slater and advised that Slater had a pulse. A couple of seconds later, the paramedic advised that Slater did not have a pulse. Gentry immediately removed the handcuffs and hobble restraints from Slater.

From the Deasey interview he remembers the following: After attaching the hobble around the front of the vehicle's cage he secured it by closing the rear passenger door onto it. Seconds after both rear passenger doors were closed, Deasey monitored Slater's movement through the exterior of the left rear passenger door. Deasey immediately noted Slater did not appear to be moving. Deasey spoke with Gentry about the lack of movement Slater was displaying. After further examination, Deasey described Slater lying on his left side of his body, with his stomach partially on the backseat. Slater's face was facing toward the front of the vehicle and was not obstructed. Deasey opened the driver's side rear passenger door. Slater appeared to take 2 deep breaths. Deasey attempted to speak to Slater but he (Slater) did not respond to Deasey. It appeared to Deasey that Slater stopped breathing. The right rear passenger door was opened and Slater was pulled out to be assessed by fire personnel. Fire personnel advised that Slater had a pulse, but was unresponsive. Fire personnel placed an EKG machine onto Slater. Fire personnel notified Deasey, Slater no longer had a pulse and began performing CPR.

From the investigator's report at the scene (page COSB 00012) the following was noted: The driver's side door of the first patrol car (Deputy Deasey's vehicle) was open and there was liquid appearing consistent with vomit on the back seat of the patrol car. Outside the rear passenger's side door of the car, on the pavement, was a dry fluid appearing to be consistent with vomit. The vomit trail went in a northwest direction. Northwest of the pool of vomit was a white t-shirt which was cut and appeared to have vomit stains on it. There was also a smell, similar to pepper spray on the white t-shirt.

From the interview with Beard he remembered somewhat similar events as follows: He stated that the deputies were concerned that Slater was going to kick out one of the windows. The deputies opened the rear door and began to attach a second hobble strap to the already attached to Slater's legs. Beard saw the deputies trying to pull the hobble strap through the rear safety cage. A deputy was holding the hobble strap that had been pulled toward through (sic) the safety cage. Beard heard the deputies talking about needing a third hobble strap. Beard could not see if or how the hobble strap was finally secured. Beard stated that once all the doors of the vehicle were closed, a deputy mentioned that Slater was not moving and appeared not breathing. Beard heard a deputy say something was not right with Slater. The deputies opened the rear door and looked inside and saw Slater was no longer moving and Beard could not tell if Slater was breathing.

Beard stated that Slater was removed from the vehicle and place on the ground. Beard checked for a pulse and located one. Beard saw vomit over Slater's face, which was not present when he previously examined Slater. Beard told his captain to call AMR to respond back to the scene, while the fire crew were retrieving medical equipment that had already been put away. Beard rechecked Slater for a pulse and was unable to locate one. Beard described Slater's breathing as agonal. Beard cut open Slater's t-

shirt and the deputies removed the handcuffs and hobble straps. Beard estimated approximately 2 to 3 minutes had elapsed from the time Slater was removed from the vehicle to when CPR was initiated.

Beard attached a cardiac monitor (AED) on Slater and observed no heart rhythm. An electric shock was not administered as there was no heart rhythm. Slater remained in asystole and was not breathing.

From the surveillance video times (page COSB 00071) the following occurred: between 0148-0151 hours the suspect (Slater) is pulled out of the vehicle from the passenger side rear door and placed on the ground next to the vehicle. The fire dept. personnel check the suspect (Slater) and walk back to their fire engine and grab their medical equipment. The fire dept. personnel begin rendering medical aid; between 0151 and 0152 hours deputies remove the handcuffs and hobble strap; between 0152 and 0156 hours CPR is started; between 0156 and 0204 hours the ambulance arrives on the scene. According to the AMR records, their time of arrival was 0159 hours. The suspect is placed on the gurney and into the back of the ambulance; at 0206 hours the ambulance leaves.

Slater was placed upon a backboard and an intravenous (IV) line was established while chest compressions were administered. In addition, 2 rounds of epinephrine were administered. Intubation was being attempted when the AMR ambulance crew arrived. The AMR crew took over compressions during the intubation attempt. AMR crew helped suction the oropharynx during intubation attempt which was unsuccessful. Therefore, a King airway was inserted. Slater was moved to an AMR gurney secured to a backboard. Slater was moved to the AMR ambulance with the fire dept. cardiac monitor with minimal interruptions in CPR. Slater remained in asystole and was reassessed after every 2 minutes of CPR. Slater was transported to St. Bernadine's ER with 2 fire fighters (one of which was Beard) and 2 additional rounds of epinephrine were given enroute with no change. Slater was continuously suctioned, an OG was inserted and he was ventilated with asynchronous CPR throughout transport. Slater remained in asystole. Upon arrival (per AMR records 0213 hours) to ER report was given and care transferred to hospital staff.

St. Bernadine's ED staff took over CPR and ACLS functions from the AMR personnel. Per the medical records (page COSB 00167) upon arrival at 0216 hours Slater arrived with fixed and dilate pupils, no pulse and no spontaneous breathing with a King airway and in full arrest with 4 rounds of epinephrine prior to the ED admission. From the HPI section, it appears that at one point prior to going into asystole there was a heart rate of 170 and 2 breaths per minute prior to going into asystole. From the ED records, it appears that the King airway was removed and that Slater was intubated at first attempt and the ETT was secured at 24 cm at the lips (page COSB 000173). The code sheet (page COSB 00174) indicates the IV cannula (14 gauge needle) was placed in the left AC and 0.9% normal saline was infused. The code sheet also noted that a second IV, 18 gauge needle, was place in the right AC. The ED code sheet notes the time of arrest as 0145 hours. The code sheet notes that the code team arrived and started at 0216 hours (same time as arrival to ED). The code sheet also noted that Slater was in asystole from 0216 hours until the code was called at 0227 hours. The code sheet also notes 3 rounds of epinephrine was given and 2 boluses of bicarbonate were given.

    A.    Significant Factual Inferences.

It appears that there was a significant amount of vomit found at the scene, which may indicate a major vagal/parasympathetic stimulus causing both vomiting and likely severe bradycardia vasodilation and

12

ultimately cardiovascular collapse. Of note, there was no recording of Slater's body temperature in the records contemporaneous to the time of the incident. A body temperature was taken at 0303 hours at the request of the Coroner's investigator's phone discussion with the ED Nurse and the temperature was 98.1° F (page COSB 00107). Therefore, this temperature was taken 36 minutes after Slater was pronounced dead and at least an hour and 10 minutes since going into asystole in a cold environment having had his face and head flushed with cold water and only wearing a t-shirt (which was also very likely wet and allowed for evaporative cooling and continued wet applied to his skin and inhibiting insulation effects).

In addition, Slater was given an unknown amount of cold saline by the paramedics and in the ER plus at least two 50 ml vials of cold bicarbonate. All of which could cause a decrease in Slater's likely prior febrile state when he was first noted by the Valero employee to be sweating about 2 hours prior that night with ambient temperatures likely to be in the 40° range.

Of note, upon the Coroner's Investigator report it should be noted that Slater had 2 different shoe types of different brands. The investigator also notes that Slater's body smelled of vomit. In addition, the investigator report also notes that there were 83 white capsules labeled ZA48 visually similar for divalproex (valproic acid).

    B.    Autopsy and Toxicology Report Facts.

AUTOPSY AND TOXICOLOGY REPORT:
The post mortem **femoral blood** sample toxicology findings are as follows:
Methamphetamine LC/MS/MS --1.104 mg/L
Amphetamine LC/MS/MS -- 0.116 mg/L

The post mortem **vitreous sample** toxicology findings are as follows:
Methamphetamine LC/MS/MS -- 1.230 mg/L
Amphetamine LC/MS/MS -- 0.108 mg/L

The post mortem **urine sample** toxicology findings are as follows:
Methamphetamine LC/MS/MS – greater than 50.000 mg/L
Amphetamine LC/MS/MS – 6.670 mg/L

Pertinent Autopsy Findings:
Slater was noted to be 71 inches tall (5' 11") and weighed 168 lbs. The gross autopsy findings by medical examiner Dr. Schuman noted injuries as cuts, abrasions, and bruising; but no broken bones and no internal injuries. Therefore, Dr. Schuman noted these findings which were not causative or contributory to Slater's death (per Dr. Schuman's deposition).

The heart was normal in size and shape and weighed 290 grams without coronary artery plaque or myocardial fibrosis. The lungs were noted to be without prominent congestion or edema on cut sectioning and the pulmonary vessels and airways were unobstructed.

Based upon the autopsy findings and toxicology results, Dr. Schuman indicated that the cause of death was "acute methamphetamine intoxication." From the clinical pharmacology literature regarding

methamphetamine to peak blood levels are as follows: when a single 30 mg dose was given to 10 young men the average peak blood level at 3 – 5 hours later averaged 0.094 mg/L. This methamphetamine dose to blood level ratio is in contrast to Slater's methamphetamine level of 1.104 mg/L.

Using this dose to blood level ratio would indicate that **Slater's "methamphetamine dose" was approximately 10 times greater than a 30 mg dose, and therefore would indicate that Slater's dose was about 300 mg dose**.

In rare cases when patients are prescribed methamphetamine, the dose range is 5 to 20 mg. Per Dr. Schuman's deposition, she stated that the methamphetamine and amphetamine toxicology levels were very elevated and much greater than what she has noticed in the past: she also concluded that such levels were consistent with the only cause of death.

Dr. Schuman also testified that these blood levels are consistent with Slater having taken methamphetamine within 6 hours of his death. Dr. Schuman also testified that Slater's struggling with the deputies could possibly have contributed to his death along with his acute methamphetamine intoxication effects. Further, she does not believe that pepper spray was in any way causative or contributing to Slater's death.

Dr. Schuman comments upon the symptoms or signs of methamphetamine toxicity (p103 of deposition). "Some of the signs and symptoms that can occur with methamphetamine are agitation, aggression, delirium-like behavior, sweating, and then again, the high heart rate and blood pressure." However, Dr. Schuman stated (p108-109 of deposition) that it is possible that Slater's struggling and resisting arrest and restraint and vigorous physical exertions could also exacerbate or contribute to his cardiac arrest from methamphetamine.

Dr. Schuman also stated (p95-98 of deposition) that the use of pepper spray/OC would not have caused or contributed to Slater's death with a very reasonable degree of medical certainty. From Dr. Shuman's deposition, when Dr. Schuman was asked, "So do you know whether or not it (OC) affects breathing or respiratory?" Dr. Schuman answered, "Based upon my education, it does not affect respiratory in a meaningful way."

Dr. Schuman was also asked in her deposition, "Doctor, does OC spray affect heart rate?" She answered, "Not to my knowledge."

Dr. Shuman was also asked, "Can you describe the effects of pepper spray that would be on a person, the signs and symptom?" She answered, "On the molecular level, no I cannot. I know pepper sprayed in someone's face, it irritates their eyes, and--but other than that I know of no internal effects on the body."

When Dr. Schuman was asked if she is familiar with positional asphyxiation she answered that she was. She was asked, "What effect does hobble-tying and handcuffing and individual affect – what is the effect on the body as far as response by their heart?" She answered, "On the heart, it has no effect."

Dr. Schuman was further asked, "As far as being hobbled and handcuffed, if you were hobbled and handcuffed, it would affect your respiratory breathing; correct?" She answered, "Hobbling, based on the studies that have been done, have been shown to not affect – not cause hypoxia or asphyxia – in any

14

way." She was further asked, "What about the position itself if you were placed on your side or on your back or on your stomach? Does that affect your respiratory breathing?" She answered, "Based on the same studies, there were some minor changes to respiration, but no causes of – it did not lead to hypoxia or asphyxia." She based her opinions on an article by Chan et al.

### 5. Summary of Opinions:
#### A. Plaintiffs' Injury and Death Contentions.

Plaintiffs' allege that the use of OC/pepper spray to Slater by the deputies was the major cause of death: by causing Slater to suffer difficulty in breathing, resulting in a critical medical emergency. Next it is alleged that for unknown reasons, Slater was pepper sprayed in the back of the Deputies' police unit, while handcuffed and showing no signs of resistance. It is further alleged that pepper spray had a devastating, deadly impact on Slater's breathing. It is also alleged that, as Slater was being removed from the police vehicle, Slater was having a respiratory emergency and suffocating. It is also alleged that while Slater was sitting in the parking lot, handcuffed, struggling to obtain air, the City paramedics responded and provided assistance including using the faucet to wash off the OC which plaintiffs' allege caused pain and interfered with Slater's respiratory breathing. It is also alleged that at all times Slater was cooperative with the Deputies and paramedics.

Finally, it is alleged that after being treated for the OC and respiratory distress, the deputies hog-tied, or hobble-tied the legs of Slater and put Slater in the back seat of the mace filled police vehicle. Once again, according to plaintiffs', Slater struggled to breathe and was gasping for air and unable to breathe, the mace had not dissipated. Thus, according to plaintiffs', Slater was hog/hobble-tied and inside a contaminated mace-filled vehicle, was struggling to breath, and no assistance was rendered until Slater stopped breathing. In addition, according to plaintiffs', Slater was exhibiting abnormal behavior, and it was known that Slater suffered from mental disorders which would have caused him to act abnormal at times as known by law enforcement.

#### B. Response to Plaintiffs' Allegations and Related Conclusions.

While I do not claim to make credibility determinations as to witness testimony, plaintiffs' incident and causation allegations are not consistent with the record and forensic evidence that I have reviewed in this case or with scientific fact.

In contrast to the allegations above, **there is no scientific evidence or prospective randomized studies that pepper spray (OC) causes clinically significant respiratory problems in humans or that would result in death.**

In addition, there are prospective randomized studies in humans that demonstrate that the direct inhalation of OC versus a saline control inhalation, creates only mild decreases in FEV1 (the effects beginning within 10 seconds and end within 60 seconds or less) in both healthy individuals and those with asthma.

Although there have been case reports (as opposed to clinical studies) that have been cited in the literature alleging that OC was a possible (not probable) cause of death, these case reports were not clinical, peer-reviewed studies and there has not been any case where OC has been scientifically proven to be the cause of death. Significantly, in these non-clinical case reports, there were other confounding

15

clinical findings that were also possible causes of death. These other confounding findings included, most commonly: single or multiple drug intoxication, resisting arrest and struggling, cardiomyopathy, hypertrophic cardiomyopathy, pulmonary hypertension, an underlying genetic disorder(s), etc., and most importantly, excited delirium, which is generally a diagnosis of exclusion unless very specific neuropathology studies are performed. All of these non-clinical case reports that have implicated pepper spray use where death occurred to subjects resisting arrest, all such non-clinical reports have a similar or identical set of circumstances to the instant case. In other words, although there is published non-clinical literature alleging a link between pepper spray use and death, those reports are not medically reliable because: (a) the reports were not part of any clinical study and were not part of a peer-reviewed process oriented toward pathology or epidemiology; and (b) in the reports themselves, there were always other factors which have a much higher probability for causing death and whose causal relationship to death has been proved by scientific methods. Accordingly, I have disregarded these unscientific case studies as medically irrelevant.

The instant case clearly involved Mr. Slater having the following clinical findings. First, he was very severely intoxicated (BEFORE any contact with law enforcement) from a very large dose of methamphetamine (see postmortem blood levels) and he displayed common clinical findings consistent with this. The clinical signs of methamphetamine-induced psychotic behavior (many of which are caught on surveillance video) are the following:

- dressing inappropriately for the situation (t-shirt after midnight when the ambient temperature is less than 50° F);
- acting inappropriately and in a psychotic state -- mesmerized by bright lights, moving quickly from one task to another but unrelated task (tangential thinking);
- acting irrationally (pulling out electrical wires and stacked logs and then trying to get into the "cashiers indoor/outdoor window sliding system," then staring at the LED advertising screen, etc.);
- talking to himself and saying irrational and tangential ideas/thoughts;
- not following commands (by the Valero employee who clearly indicated that Slater was a "tweaker" or by the deputies).

In addition, these same signs were also clearly documented by lay witnesses, paramedics, and law enforcement personnel.

The issues which engendered the 911 call for assistance by the Valero employee were (but not limited to):

- Slater was noted to be sweaty and was wiping his face from sweat,
- Slater was agitated and running around, talking to himself, staring at the LED advertising screen,
- Slater was pulling out wires, near the cashier's window.

As noted in the factual summary above, Slater demonstrated multiple signs of irrational aggression, agitation, incoherence, active physical resistance, and irrational conduct; along with being sweaty in a cold environment, despite the fact that he was underdressed for the environment.

Significantly, Slater's methamphetamine and amphetamine levels were very large and, per the forensic pathologist, Dr. Shuman's opinion, was labeled "acute methamphetamine toxicity" from her cause of death report and her deposition these levels were in and of themselves the cause of death.

**I agree with Dr. Schuman that the proximal cause of death was acute methamphetamine intoxication with possible contribution from his struggling/resisting physical and behavioral activity.** As such, the cause of death here is best described either as methamphetamine toxicity or methamphetamine-induced excited delirium. All of the clinical findings support both descriptions.

However, in my view, it appears that excited delirium (or EXD) is the more precise description of the cause of death here, as all major criteria available from the records and reports support such a finding: (1) Slater was sweaty/sweating, inappropriately dressed for a cold environment; (2) he showed signs of severe agitation, and inappropriate movement,; (3) he was staring at the LED screen and TV and appeared to be mesmerized by it; (4) he was talking to himself, yelling, mumbling and screaming non-sequitur thoughts ("Jesus" and numbers) and ideas; (5) he was acting paranoid (claiming people were trying to kill him and pouring gasoline on him) when he was not under such threat; (6) he was mistaking physical issues (pouring water and mistaking that for gasoline), which is associated with delirium; (7) he had a very elevated heart rate (per the paramedics, Slater's cardiac rate was 160/minute versus the St. Bernardine records where it was measured at 170/minute); (8) he had sudden unexpected agonal breathing, loss of consciousness, and rapid loss of heart rate to asystole; and (9) all of which was preceded by substantial vomiting (potentially severe Vagal/parasympathetic physiologic response). The only clinical finding usually associated with EXD that was not identified was that of elevated body temperature (which is only sometimes reported with EXD): but such was not measured at the time of the incident arrest. Notably, Slater's body temperature of 98.1° F. was taken 36 minutes after the code, as well as more than an hour after he arrested, and long after he was given cold IV fluids and likely had significant evaporative cooling after being having his face and head hosed off).

From the above findings, I base my opinion that that methamphetamine-induced EXD is more likely than not the cause of Slater's death, upon my knowledge of the literature, experience and training as a physician and clinical pharmacologist. I have reached this conclusion to a reasonable degree of medical certainty.

**Next, I also agree with Dr. Schuman that pepper spray (OC) to Slater's face was not a cause of contributing factor in his death.** I base this on my knowledge of the literature and experience and training as both a physician and clinical pharmacologist.

As noted above, various prospective randomized studies of having subjects (normal healthy and asthmatic subjects) inhale low, medium, and large amounts of OC spray and measuring various respiratory responses demonstrate non-clinically significant affects. The affects occur rapidly within about 10 seconds and terminate within about 60 seconds or less (Fuller, et al., 1985; J. Applied Physiology).

A retrospective meta-analysis of studies over a 20-year period (Dicpinigaitis, et al., 2005; Chest), looking at 4,833 subjects exposed to direct inhalation of OC undergoing the OC cough challenge reported no serious adverse events. These subjects included healthy patients, as well as those with asthma and

17

COPD, pathologic cough and other respiratory conditions. Minor complaints were recorded in various studies and were mainly transient throat irritation. The authors concluded that no single serious adverse event was associated with the OC inhalational cough challenge tests even in subjects with underlying pulmonary diseases.

Further, a very elegant prospective randomized study was done on adult volunteers who were OC sprayed and were then subjected to different physical restraint body positions (simulating suspects being restrained by law enforcement body positions), and then measured their respiratory changes (FVC, FEV1, oxygen saturation and carbon dioxide levels as well as heart rate and blood pressure). This study measured these changes between baseline (sitting quietly and not subjected to pepper spray) and then in different restraint positions and handcuffed, with or without OC spray. The results showed that while there was a decrease in FVC and FEV1 and an increase in blood pressure, as would be expected no life threatening and clinically significant changes in FVC, FEV1, hypoxemia, or hypercarbia. However, OC spray did result in an increase in blood pressure.

The authors concluded (Chan, et al., Dec., 2001 Natl' Institute of Justice) that OC spray exposure and inhalation do not result in a significant risk for respiratory compromise or asphyxiation. Moreover, even when combined with positional restraint, OC inhalation does not result in an increased risk of ventilator failure or asphyxiation.

Another study by Chan et al., 2007 (J Forensic Science), examined the ventilatory (respiratory) and metabolic demands during aggressive physical struggling while in prone maximal restraint position (PMRP) and with up to 90 to 102 Kg of weight on their back, in 27 healthy adults. Their results demonstrated that while there was a decrease in ventilatory function in PMRP with the maximal weight on their backs and vigorous/maximal struggling, this decrease in ventilatory function was of no clinical importance. The authors further state that factors other than ventilatory failure associated with sudden unexpected deaths in restrained individuals. The cause of death in those who succumb suddenly is a pattern inconsistent with a respiratory death. Some individuals have been reported to die even in a supine, sitting, or side position even without being restrained. The authors cite the following factors: EXD, drug intoxication, stress, catecholamine hyper-stimulation, as the most likely factors in these sudden unexpected in custody deaths. The authors cite animal studies that indicate that restraint alone (without affecting an animal's ability to breathe) increases the death rate in animals treated with cocaine. This implies that the physiologic effects of restrain involve more than the ventilation alone, which is consistent with the results of their study and other studies.

Further, vary large retrospective studies of thousands of people pepper sprayed by law enforcement with and without struggling have not reported any serious cardio-pulmonary/respiratory effects even in asthmatics that required hospitalization. For example, a 2015 study by Hall et al., (J Forensic and Legal Medicine) reviewed in police use of force events: examining sudden in custody death for prone and not prone position in 4,823 subjects of which over 2,000 subjects were in prone position. Only one subject unexpectedly died with all 10 features of EXD. Another retrospective study (Kearney, et al., 2014, Prehospital Emergency Care) of 4,554 subjects (of which 754 subjects were direct inhalational exposures not dermal/skin exposures) over a 10-year period subjected to OC spray, noted no deaths, and a very low incidence of mild-moderate wheezing of bronchospasm for an incidence of 0.0027%. It is important

to note that as opposed to type of exposure in Slater's case was facial = dermal/skin exposure not direct inhalational exposure.

Therefore, I reiterate that with a reasonable degree of medical certainty that the use of OC spray on Slater would not have caused or contributed to his death, and that his underlying methamphetamine toxicity was the cause of his death.

I reserve my right to amend this report based on plaintiffs' expert reports or testimony or forthcoming depositions or any additional evidence. I will make myself available for deposition in San Diego or otherwise (upon advance payment of my travel expenses and time) on a mutually-agreeable date and time prior to the applicable discovery cut-off.

My CV, testimony list, and fee schedule are attached to this report and incorporated here by reference. Please let me know if you have any questions.

Sincerely,

Richard Ruffalo, MD, PharmD
Assistant Clinical Professor of Anesthesiology
David Geffen / UCLA School of Medicine